

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHESTER SHANE McVAY, | § | |
| | § | |
| Movant, | § | |
| | § | CASE NO. **3-07CV1101-M** |
| v. | § | |
| | § | |
| HALLIBURTON ENERGY SERVICES, | § | **REQUEST FOR ORAL ARGUMENT** |
| INC., | § | |
| | § | |
| Respondent. | § | |

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FILED**
JUN 2 0 2007
CLERK, U.S. DISTRICT COURT
BY _____
Deputy

1 2 4 9 2

## MOTION OF CHESTER SHANE MCVAY TO VACATE
## FINAL ARBITRATION AWARD AND BRIEF IN SUPPORT

Chester Shane McVay ("McVay" or "Movant") files this Motion to Vacate Final

Arbitration Award and Brief in Support entered in favor of Halliburton Energy Services, Inc.

("HES" or "Respondent") in the AAA arbitration styled *Halliburton Energy Services, Inc v.*

*Chester Shane McVay,* AAA No. 71 480 00074 06 ("Arbitration") and would show the court the

following:

### JURISDICTION

1.      Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1332, because the

underlying Arbitration is between citizens of different states, and because the matter in

controversy exceeds the sum of $75,000.00 exclusive of interest and costs. Movant is an Illinois

resident.  Respondent is a Delaware corporation with its principal place of business in Dallas

County, Texas.

2.      The Court has personal jurisdiction over Respondent in this matter pursuant to 28

U.S.C. §1391.  Respondent conducts business in Texas, maintains its principal place of business

in Carrollton, Dallas County, Texas, and thus, has sufficient minimum contacts so that the

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support                                    page 1
R:\I\1072\60673\SubPldgs\MotionVacateAward.doc

exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

3.      This Court has authority to consider this Motion pursuant to the Federal Arbitration Act ("FAA").  Section 10 of the FAA provides that "the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration."  9 U.S.C. § 10(a).

## VENUE AND SERVICE

4.      The Arbitration occurred and the Final Award was made in Dallas, Texas.  According to 9 U.S.C. § 10, venue is proper in the Northern District of Texas, Dallas Division.  Respondent is a resident of the district in which the award was made and is being served with this Motion in accordance with its Dispute Resolution Rules ¶ 23 and 9 U.S.C. § 12.

## BACKGROUND

5.      The Arbitration was conducted in accordance with the Halliburton Dispute Resolution Plan and Halliburton Dispute Resolution Rules.  Appendix at p. 1-14.  The Arbitration hearing was conducted before Karen K. Fitzgerald (the "Arbitrator") and administered by the American Arbitration Association ("AAA").  The Final Award was made in Dallas County, Texas and signed on March 21, 2007.  Appendix at p. 15-34.

6.      The Arbitrator made a number of decisions regarding claims, counterclaims and affirmative defenses.  Evidence of partiality exists warranting the vacatur of the entire Final Award, including the denial of relief sought by McVay.  Further, and in the alternative as may be necessary, vacatur is required of the affirmative relief awarded by the Arbitrator for:

- damages for breach of contract in the amount of $24, 047.27;
- expert witness costs of $20,944.15;
- injunctive relief from "utilizing in any fashion any paper and electronic copies of any documents and tangible things that concern HES products or services";
- attorney's fees for $150,000 for HES's breach of contract claim.

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support                                    page 2
R:\1\1072\60673\SubPldgs\MotionVacateAward.doc

Appendix at p. 33-34.

## LEGAL BASES FOR VACATUR

7.      Statutory bases for vacating an arbitration award are found in 9 U.S.C. § 10(a).

The section provides a district court has the authority to vacate an award if:

(a)     the award was procured by corruption, fraud, or undue means;

(b)     there is evidence of partiality or corruption among the arbitrators;

(c)     the arbitrators were guilty of misconduct which prejudiced the rights of one of the parties; or

(d)     the arbitrators exceeded their powers.

9 U.S.C. § 10(a).

8.      The Fifth Circuit also recognizes "manifest disregard of the law" as a non-statutory ground for vacating an arbitration award. *Prestige Ford v. Ford Dealer Computer Svcs., Inc.,* 324 F.3d 391, 395 (5th Cir. 2003).  As the Second Circuit has noted:

> "Manifest disregard of the law" is a judicially-created ground for vacating an arbitration award which was introduced by the Supreme Court in *Wilko v. Swan,* 346 U.S. 427, 436-37 (1953).  Although the specific bounds of this ground are not defined, it means more than error or misunderstanding with respect to the law.  The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.  The term "disregard" implies the arbitrator appreciates the existence of a clearly governing principle but decides to ignore or pay no attention to it.

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 934 (2d Cir. 1986) (internal citations omitted).

## VACATUR OF FINAL AWARD APPROPRIATE FOR ARBITRATOR PARTIALITY

9.      The Arbitrator, almost a year after HES demanded arbitration and one month after the arbitration hearing was completed (only post-hearing briefing remained), revealed she was

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support                                          page 3
R:\1\1072\60673\SubPldgs\MotionVacateAward.doc

neighbors, and she and her husband were social, with the son of a named member of HES's outside counsel. Appendix at p. 35. The relationship was initiated when Dallas SWAT cleared her residence to resolve an incident two doors away, one door away from Mr. Crutsinger. The Arbitrator's partiality basis for vacating the award a campaign by HES against McVay modifying electronic files, refusing to produce responses, requested items, and discovery invading Mr. McVay's privacy and searching his personal computers and now attempting to force him out of the entire industry. The parties were completing post-hearing briefing, had spent approximately five days in the arbitration hearing (over two separate sessions) and had spent significant sums reaching the end of the arbitration. Importantly, this information was discoverable by the Arbitrator in November, approximately a month before the arbitration hearing began. *See* Appendix at p. 35 (Arbitrator's Disclosure).

10.     The Arbitrator, in not disclosing this suspiciously-timed introduction and social relationship, presents the reasonable impression of bias and evident partiality. The social relationship began late in the arbitration proceedings, but approximately one month before the actual arbitration hearing was to occur. Ample time and opportunity existed to reveal the information, particularly since the Arbitrator's husband was corresponding with the individual and even picking up his mail. However, this simply was not done. The rules under which the parties agreed to arbitrate require that, as a basic qualification for an arbitrator, the arbitrator "shall have no relation to the underlying dispute or to the parties or their counsel that may create an appearance of bias." AAA Employment Arbitration Rules, Rule 12(b)(ii). The failure to disclose is a clear manifestation of bias and certainly "creates an appearance of bias" prohibited by the parties' agreed-to rules.

11.     Subsequently, HES, on its own initiative and outside of the rules or the agreement

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support                                                    page 4
R:\1\1072\60673\SubPldgs\MotionVacateAward.doc

of the parties, submitted a proposed order. Appendix at p. 36-47. AAA advised the "the Arbitrator has advised she does not want to receive a copy of the proposed award." Appendix at p. 48-49. However, similarities between the proposed award and the Final Award indicate such was provided and reviewed by the Arbitrator, while McVay did not have an opportunity to present his own for consideration. For example, but not by way of limitation, the following are largely identical:

| Proposed Order: Relief Awarded | Final Award |
| --- | --- |
| ¶ 2(I) | V(1)(b) |
| ¶ 3(B) | V(1)(c) |
| ¶ 3(C) | V(1)(d) |
| ¶ 3(D) | V(1)(e) |
| ¶ 4 | V(1)(b) |

The arbitration itself is marred with irregularities from files used as evidence having been re-saved and modified, personal files going missing from computers after searches, and disregard for the clear terms of a questionably-obtained temporary restraining order, which ultimately plays a large part the Arbitrator's Final Award, to name a few. These irregularities are simply compounded by an arbitrator maintained in violation of the AAA Employment Arbitration Rules. The foregoing establishes partiality on behalf of the Arbitrator requiring vacatur of the improper Final Award.

### VACATUR OF RELIEF GRANTED TO HES WARRANTED

12. If this court does not vacate the Final Award as requested above, McVay requests the following, in the alternative as may be necessary, portions of the Final Award be vacated.

**A. Breach of Contract Damages and Expert Witness Costs Improperly Awarded**

13. Respondent was awarded damages for its breach of contract claim in the amount of $24,047.27 and a separate expert witness fee award. The Arbitrator exceeded her powers in

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support
R:\I\1072\60673\SubPldgs\MotionVacateAward.doc                                                            page 5

making the award.

14.     In determining whether an arbitrator's award should be vacated because the arbitrator exceeded the scope of his authority, the reviewing court must examine the language in the arbitration agreement. The Fifth Circuit has held that:

> The arbitrator's authority is circumscribed by the arbitration agreement, and he can bind the parties only on issues that they have agreed to submit to him. Whether an arbitrator has exceeded these bounds is an issue for judicial resolution. [citations omitted] For that reason, an arbitrator who derives his power solely from the contract cannot hold that charter to be legally ineffective.

*Piggly Wiggly Operators Warehouse v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union,* 611 F.2d 580, 583 (5th Cir. 1980); *accord Executone Info. Sys., Inc. v. Davis,* 26 F.3d 1314, 1323 (5th Cir. 1994) ("it is well-settled that the arbitrator's jurisdiction is defined by both the contract containing the arbitration clause and the submission agreement".

15.     The $24,047.27 damage figure is a calculation, although apparently inaccurate, comprised of:

| | |
|---|---|
| Expert fees: | $11,828.52 |
| | $ 5,081.75 |
| Employee Compensation | $ 7,200.00 |

Appendix at p.24-25, p. 34.

16.     The Arbitrator also separately awarded expert witness costs in the amount of $20,944.15. Appendix at p. 34.

17.     The Dispute Resolution Rules specifically provides the following, controlling provision:

> 32.     Fees and Expenses
> * * *
> D.     the fees and expenses of experts, consultants and others retained or consulted by a Party shall be

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support                                                             page 6
R:\I\1072\60673\SubPldgs\MotionVacateAward.doc

Appendix at p. 11.                                          borne by the Party utilizing those services.

18.     The Arbitrator exceeded her authority in awarding expert fees and compensation for an employee consulted, regardless of the characterization. The Dispute Resolution Rules specifically allocate to the party incurring such expenses the responsibility to bear same. *Id.*

19.     An arbitrator exceeds her authority when granting relief outside of the parties' agreement. 9 U.S.C. § 10(a)(4); *Reliastar Life Ins. Co. of N.Y. v. EMC Nat'l Life Ins. Co.*, 473 F.Supp.2d 607 (S.D.N.Y. 2007)(vacating attorney fee award where arbitration agreement required each side to bear its own). Since the Arbitrator exceeded her authority, the award should be vacated.

**B.     The Arbitrator's Injunctive Relief is in Disregard of the Law**

20.     The Arbitrator awarded injunctive relief. The provision at issue is as follows:

     1)     Injunctive Relief against McVay as follows:

         a)     McVay and those acting in concert with him are enjoined from utilizing in any fashion any paper and electronic copies of any documents and tangible things that concern HES products or services

21.     A trial court, or arbitrator, must weigh the respective conveniences and hardships of the parties and balance the equities when considering a permanent injunction. *Computek Computer & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 220 (Tex. App.--Dallas 2005, no pet.). The entity seeking the extraordinary remedy of an injunction must be specific in pleading the relief sought and courts cannot grant relief beyond that specified. *Id.* at 221. An injunction must be definite, clear and precise without requiring one to search for inferences or make conclusions about which individuals may differ. *Computek* at 221.

22.     Respondent did not seek the injunction provision ordered by the Arbitrator.

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support                                          page 7
R:\I\1072\60673\SubPldgs\MotionVacateAward.doc

Therefore, Movant did not have an opportunity to address it during the arbitration. The Arbitrator was well aware of Texas law regarding injunctions through the briefing provided by the parties, and chose to ignore it. Instead, the Arbitrator issued an injunction not contemplated by the parties, briefed or addressed in the arbitration, or within the scope of any of the pleadings.

23. Further, the injunctive relief granted is not definite, clear and precise. Respondent is one of the world's largest organizations in the oil and gas industry. Its market share is significant. It is currently unknown what industries or lines of business into which Respondent will enter. The injunction is perpetual, without scope or time limitations. If entered, it necessarily imposes a significant restraint on McVay's career and employment options, both now and many years from now. The injunction may force McVay from careers and jobs years after any of the information to which he had access while an employee is relevant. The injunction is not limited to any product or area in which McVay worked. The injunctive relief at issue is unclear insofar as it fails to reasonably define what "paper and electronic copies of any documents and tangible things that *concern* HES products or services" McVay cannot utilize.

24. The awarded relief is in manifest disregard of the law. McVay is unable to comply with the injunction as it does not set forth the duties and clear specific and other ambiguous terms. The Arbitrator imperfectly executed her power so that a definite award was not made. 9 U.S.C. § 10(a)(4). The breadth of the injunctive relief necessarily forces McVay and others to infer or speculate as to what activities are enjoined. McVay cannot ascertain from the injunction itself those activities from which he is barred.

25. Therefore, McVay requests the court order the vacatur of this injunctive provision.

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support                                                                    page 8
R:\1\1072\60673\SubPldgs\MotionVacateAward.doc

## C.   Attorneys' Fees Award Improper

26.    The Arbitrator awarded Respondent $150,000 in attorneys' fees. McVay objected to Respondent's evidence regarding attorneys' fees. The fee statements were redacted to the point the task or activity performed was indeterminable. The over-redacting of the statements made it impossible to address the tasks performed and whether such were reasonable and necessary. The Arbitrator agreed. Appendix at p. 30. However, the Arbitrator awarded attorneys fees by taking "judicial notice" of usual and customary fees in like cases.

27.    As set forth above, the Arbitrator improperly awarded relief to HES in the way of expert and consultant fees, and characterized such as "damages." Further, the injunctive relief is improper. Texas law requires a party to prevail on specific actions as a prerequisite to recovering attorneys' fees. *See* TEX. CIV. PRAC. REM. CODE § 38.001 *et seq.* An award of attorneys' fees cannot be predicated on the Final Award as vacated. As the "damages" and substance of the injunctive relief sought must be vacated, so too must the attorney fee award based thereon. Considering the improper bases for the award of attorneys' fees, such award must be vacated as it is in manifest disregard of the law.

## REQUEST FOR ORAL ARGUMENT

28.    Given the importance of this matter and the hardship the Arbitrator's ruling has caused Movant, Movant requests oral argument.

## CONCLUSION

29.    THEREFORE, McVay requests that the Final Award be vacated as a result of arbitrator partiality. In the alternative, insofar as necessary, McVay requests the specific portions of the Final Award identified above be vacated as the Arbitrator exceeded her powers and the awards exhibit a manifest as regard of the law. McVay requests such other and further relief, at

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support                                page 9
R:\1\1072\60673\SubPldgs\MotionVacateAward.doc

law or in equity, to which he may be justly entitled.

Respectfully submitted,

ROGGE DUNN
Texas State Bar No. 06249500
**GREGORY M. CLIFT**
Texas State Bar No. 00795835
**CLOUSE DUNN KHOSHBIN LLP**
5200 Renaissance Tower
1201 Elm Street
Dallas, TX 75270-2142
Telephone:    (214) 220-3888
Facsimile:    (214) 220-3833

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been served upon Respondent on the 20TH day of June, 2007 in accordance with the requirements of the Dispute Resolution Rules ¶ 23 and 9 U.S.C. § 12.

**GREGORY M. CLIFT**

Motion of Chester Shane McVay to Vacate
Final Arbitration Award and Brief in Support
R:\1\1072\60673\SubPldgs\MotionVacateAward.doc                                page 10



*Dispute*
*Resolution*
*Plan and*
*Rules*

The Halliburton Company
6/99

# Dispute Resolution Plan and Rules

## The Halliburton
## Dispute Resolution Plan

1.  Purpose and Construction

    The Plan is designed to provide a program for
    the quick, fair, accessible, and inexpensive
    resolution of Disputes between the Company and
    the Company's present and former Employees
    and Applicants for employment, related to or
    arising out of a current, former or potential
    employment relationship with the Company. The
    Plan is intended to create an exclusive procedural
    mechanism for the final resolution of all Disputes
    falling within its terms. It is not intended either
    to abridge or enlarge substantive rights available
    under applicable law. The Plan contractually
    modifies the "at-will" employment relationship
    between the Company and its Employees, but
    only to the extent expressly stated in this Plan.
    The Plan should be interpreted in accordance
    with these purposes.

2.  Definitions

    A.  "AAA" means the American Arbitration
        Association.

    B.  "JAMS" means Judicial Arbitration and
        Mediation Services.

    C.  "CPR" means the Center for Public
        Resources.

    D.  The "Act" means the Federal Arbitration Act,
        9 U.S.C. § 1, et seq., as amended from time to
        time.

    E.  "Company" means Sponsor and every
        subsidiary (first tier and downstream) of
        Sponsor, any Electing Entity, any entity or
        person alleged to have joint and several
        liability concerning any Dispute, and all of
        their directors, officers, employees, and
        agents, every plan of benefits, whether or not
        tax-exempt, established or maintained by
        any such entity, the fiduciaries, agents and
        employees of all such plans, and the
        successors and assigns of all such entities,
        plans and persons; provided, however, that
        in the case of an Electing Entity, "Company"
        shall include the Electing Entity only to the
        extent provided in the Electing Entity's
        agreement to be bound by the Plan.

1

F.   "Dispute" means all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Plan or by an agreement to resolve Disputes under the Plan, or between a person bound by the Plan and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to:

1.   this Plan;

2.   the employment or potential re-employment of an Employee, including the terms, conditions, or termination of such employment with the Company;

3.   employee benefits or incidents of employment with the Company;

4.   any other matter related to or concerning the relationship between the Employee and the Company including, by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; workers' compensation retaliation; defamation; infliction of emotional distress; or status, claim or membership with regard to any employee benefit plan;

5.   an Applicant's application for employment and the Company's actions and decisions regarding such application; and

6.   any personal injury allegedly incurred in or about a Company workplace.

"Dispute" includes all such matters regardless of when the events on which they are based occurred, including matters based on events occurring before the Employee became subject to this Plan (so long as such disputes were not previously asserted in a judicial forum) or after termination of the employment relationship.

G.   "Electing Entity" means any legal entity which has agreed to be bound by the Plan as provided herein.

H.   "Employee" means any person who is or has been in the employment of the Company on or after the effective date of this Plan, whether or not employed at the time a claim is brought with respect to a Dispute, residing in the United States, or otherwise subject to the laws of the United States or any state, municipality, or other political subdivision of the United States.

I.   "Applicant" means any person who is seeking or has sought employment with the Company after the effective date of this Plan.

J.   "Party" means, with respect to a particular Dispute, affected persons and/or entities bound by this Plan.

K.   "Plan" means this Halliburton Dispute Resolution Plan, as amended from time to time.

L.   "Rules" means the Halliburton Dispute Resolution Rules, as amended from time to time, which are applicable to mediation and arbitration.

M.   "Sponsor" means The Halliburton Company, a Delaware Corporation.

3.   Name, Application and Coverage

A.   The Plan shall be referred to as the "Halliburton Dispute Resolution Plan." Alternatively, it may be referred to as the "Halliburton Dispute Resolution Program" or the "Dispute Resolution Program."

B.   Until revoked by Sponsor pursuant to this Plan, this Plan applies to and binds the Company, each Employee and Applicant and the heirs, beneficiaries and assigns of any such person or entity; provided, however, that this Plan shall not apply to any Employee in a unit of Employees represented by a labor organization, or to the Company with respect to such employees, except to the extent permitted in an applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

C.   Except as provided for herein, this Plan applies to any Dispute.

2

3

APP 004

D.   Notwithstanding anything to the contrary in this Plan, the Plan does not apply to claims for workers' compensation benefits or unemployment compensation benefits.

E.   Mediation and arbitration are only available for Disputes involving legally protected rights.

F.   Notwithstanding any other provision hereof, any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under the Plan.

4.   **Resolution of Disputes**

All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Plan and the Rules.

5.   **Confidentiality**

A.   The Dispute Resolution Program ("Program"), its Administrator, any subordinate administrators, the staff of the Program and any other person conducting conferences or serving as an impartial third party on behalf of the Program in any in-house dispute resolution process conducted under the auspices of the Program, will hold matters reported under the Program and related communications in confidence, in keeping with the Standards of Practice and the Code of Ethics of The Ombudsman Association. The Code of Ethics and the Standards of Practice of The Ombudsman Association are incorporated into this Plan by reference and appended.

For purposes of requests by or subpoenas from any Party that the Program Administrator or any subordinate administrators, or any member of the staff of the Program or person conducting conferences or serving as an impartial third party on behalf of the Program in any in-house dispute resolution process conducted under the auspices of the Program, provide testimony in any internal or external investigation, administrative hearing, or arbitration or litigation proceeding, the confidentiality standards described in this

4

section attach to the Dispute Resolution Program, rather than any individual disputant. This means that only the Program, rather than any individual disputant, may waive confidentiality, and the Program may only waive confidentiality, even upon request or subpoena by a disputant, under circumstances consistent with The Ombudsman Association Code of Ethics and Standards of Practice.

B.   No employee shall be subject to any form of discipline or retaliation for initiating or participating in good faith in any process or proceeding under this Plan.

6.   **Amendment**

A.   This Plan may be amended by Sponsor at any time by giving at least 10 days notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules.

B.   Sponsor may amend the Rules at any time by serving notice of the amendments on AAA, JAMS, and CPR. However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules.

7.   **Termination**

This Plan may be terminated by Sponsor at any time by giving at least 10 days notice of termination to current Employees. However, termination shall not be effective as to Disputes for which a proceeding has been initiated pursuant to the Rules prior to the date of termination.

8.   **Applicable Law**

A.   The Act shall apply to this Plan, the Rules, and any proceedings under the Plan or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Plan or the Rules.

B.   Other than as expressly provided herein, or in the Rules, the substantive legal rights, remedies, and defenses of all Parties are

5

preserved. In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all relief, legal or equitable, including punitive damages, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceeding.

C.  Other than as expressly provided herein, or in the Rules, the Plan shall not be construed to grant additional substantive, legal, or contractual rights, remedies or defenses which would not be applied by a court of competent jurisdiction in the absence of the Plan.

D.  Notwithstanding the provisions of the preceding subsection, in any proceeding before an arbitrator, the arbitrator, in his discretion, may allow a prevailing Employee or Applicant a reasonable attorney's fee as part of the award. The discretion to allow an award of fees under this subsection is in addition to any discretion, right or power which the arbitrator may have under applicable law. However, any award of fees shall be reduced by any amounts which have been or will be paid by the Halliburton Employee Legal Assistance Plan.

9.  **Administrative Proceedings**

A.  This Plan shall apply to a Dispute pending before any local, state or federal administrative body or court unless prohibited by law.

B.  Participation in any administrative or judicial proceeding by the Company shall not affect the applicability of the Plan to any such Dispute upon termination of the administrative or judicial proceedings. A finding, recommendation or decision by an administrative body on the merits of a Dispute shall have the same legal weight or effect under the Plan as it would in a court of competent jurisdiction.

10.  **Exclusive Remedy**

Proceedings under the Plan shall be the exclusive, final and binding method by which Disputes are resolved.

6

11.  **Electing Corporations**

A.  Corporations or other legal entities, not otherwise Parties, may elect to be bound by this Plan by written agreement with Sponsor.

B.  Election may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity.

12.  **Effective Date**

The effective date of this Plan shall be June 15, 1993, as amended as of August 15, 1999.

13.  **Severability**

The terms of this Plan and the Rules are severable. The invalidity or unenforceability of any provision therein shall not affect the application of any other provision. Where possible, consistent with the purposes of the Plan, any otherwise invalid provision of the Plan or the Rules may be reformed and, as reformed, enforced.

14.  **Administration**

Sponsor shall appoint one or more persons to administer the Plan who shall be known as the "Dispute Resolution Plan Administrator." The Dispute Resolution Plan Administrator shall be responsible for the management and administration of the Plan.

15.  **Assent**

Employment or continued employment after the Effective Date of this Plan constitutes consent by both the Employee and the Company to be bound by this Plan, both during the employment and after termination of employment. Submission of an application, regardless of form, for employment constitutes consent by both the Applicant and the Company to be bound by this Plan.

7

# HALLIBURTON DISPUTE RESOLUTION RULES

## 1. Definitions

All definitions included in the Halliburton Dispute Resolution Plan apply to these Rules.

## 2. Application

A. If different rules are applicable to a specific class of Disputes, and have been adopted by Sponsor and served on AAA, JAMS, or CPR, these Rules shall not apply to such class of Disputes.

B. These Rules apply in the form existing at the time proceedings are initiated under them.

C. To the extent consistent with these Rules, the Employment Dispute Resolution Rules of AAA, JAMS, or CPR also apply to all proceedings governed by these Rules.

## 3. Initiation of the Process

A. A Party may initiate proceedings under these Rules at any time, subject to any defenses including those applicable to the timeliness of the claim, including limitations and laches.

B. A Party may initiate proceedings by serving a written request to initiate proceedings on AAA, JAMS, or CPR and tendering the appropriate administrative fee.

C. Copies of the request shall be served on all other Parties to the Dispute by AAA, JAMS, or CPR. The request shall describe the nature of the Dispute, the amount involved, if any, the remedy sought, and the proceeding locale requested.

D. Proceedings may also be initiated by an Employee or Applicant by serving a written request to initiate proceedings on the Company's Dispute Resolution Plan Administrator. In such a case, the Company shall promptly forward any properly served request it has received to AAA, JAMS, or CPR.

8

E. Parties against whom a claim is asserted shall file an answering statement within 21 days of receiving notice of intent to arbitrate or a specification of claims, which shall include any counterclaims and any request that the arbitrator (if any) prepare a statement of reasons for the award.

## 4. Administrative Conference

AAA, JAMS, or CPR shall convene an administrative conference as soon as possible after receipt of the answering statement or after expiration of the time for filing an answering statement if one has not been filed. The conference may be held in person or by telephone. At the conference, AAA, JAMS, or CPR will determine whether the Parties are in agreement on a method to resolve the Dispute. If the Parties are in agreement, AAA, JAMS, or CPR will implement the procedure in accordance with their rules upon payment of any applicable fee. If the Parties cannot agree, or if the Parties have previously attempted and failed to resolve the Dispute by mediation or another nonbinding mechanism, the Dispute shall be arbitrated under these Rules.

## 5. Appointment of Arbitrator

Immediately after payment of the arbitration fee, AAA, JAMS, or CPR shall simultaneously send each Party an identical list of names of persons chosen from a panel of qualified arbitrators which AAA, JAMS, or CPR shall select and maintain. Each Party to the Dispute shall have fourteen (14) days from the transmittal date to strike any names objected to, number the remaining names in order of preference, and return the list to AAA, JAMS, or CPR. If a Party does not return the list within the time specified, all persons therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the order of mutual preference, AAA, JAMS, or CPR shall invite the acceptance of the arbitrator to serve. Any Party shall have the right to strike one list of arbitrators in its entirety. When a Party exercises this right, AAA, JAMS, or CPR shall issue a new list of arbitrators consistent with the above procedures.

9

**6. Qualifications of the Arbitrator**

No person shall serve as an arbitrator in any matter in which that person has any financial or personal interest. Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias. Upon receipt of such information from the arbitrator or any other source, AAA, JAMS, or CPR will either replace that person or communicate the information to the Parties for comment. Thereafter, AAA, JAMS, or CPR may disqualify that person, and its decision shall be conclusive.

**7. Vacancies**

If a vacancy occurs for any reason or if an appointed arbitrator is unable to serve promptly, the appointment procedure in Section 5 shall apply to the selection of a substitute arbitrator.

**8. Date, Time and Place of Hearings**

A. The arbitrator shall set the date, time and place of any proceeding.

B. Notice of any hearing shall be given at least ten (10) days in advance, unless the arbitrator determines or the Parties agree that a shorter time is necessary.

C. The arbitrator shall make every effort, without unduly incurring expense, to accommodate the Employee or Applicant in the selection of a proceeding location.

**9. Conferences**

At the request of AAA, JAMS, or CPR or of a Party or on the initiative of the arbitrator, the arbitrator or AAA, JAMS, or CPR may notice and hold conferences for the discussion and determination of any matter which will expedite the proceeding, including:

A. venue,

B. clarification of issues,

C. determination of preliminary issues, including summary determination of dispositive legal issues,

D. discovery,

E. the time and location of proceedings or conferences,

F. interim legal or equitable relief authorized by applicable law,

G. pre- or post-hearing memoranda,

H. stipulations; and / or

I. any other matter of substance or procedure.

**10. Mode of Hearings and Conferences**

In the discretion of the arbitrator or by agreement of the Parties, conferences and hearings may be conducted by telephone or by written submission, as well as in person.

**11. Pre-hearing Discovery**

A. On any schedule determined by the arbitrator, each Party shall submit in advance, the names and addresses of the witnesses it intends to produce and any documents it intends to present.

B. The arbitrator shall have discretion to determine the form, amount and frequency of discovery by the Parties.

C. Discovery may take any form permitted by the Federal Rules of Civil Procedure, as amended from time to time, subject to any restrictions imposed by the arbitrator.

**12. Representation**

Any Party may be represented by counsel or by any other authorized representative.

**13. Attendance at Hearings**

The arbitrator shall maintain the privacy of the proceedings to the extent permitted by law. Any person having a direct interest in the matter is entitled to attend the proceedings.

The arbitrator shall otherwise have the power to exclude any witness, other than a Party or other essential person, during the testimony of any other witness. The arbitrator shall determine

10                                             11

whether any other person may attend the proceeding. Upon the request of any Party, the arbitrator shall exclude any witness during the testimony of any other witness.

### 14. Postponement

A. The arbitrator, for good cause shown by a Party, or on agreement of the Parties, may postpone any proceeding or conference.

B. The Pendency of court proceedings related to the same matter is not good cause for postponement.

### 15. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by any Party, shall do so.

### 16. Record of Proceedings

There shall be no stenographic, audio, or video record of the proceedings unless either requested by one of the Parties or specified by the arbitrator. The Party requesting the record shall bear the entire cost of producing the same. Copies of the record shall be furnished to all other Parties upon request and upon payment of the cost of reproduction.

### 17. Procedure

The proceedings shall be conducted by the arbitrator in whatever order and manner will most expeditiously permit full presentation of the evidence and arguments of the Parties.

### 18. Arbitration in the Absence of a Party

The arbitrator may proceed in the absence of Parties or representatives who, after due notice, fail to be present or fail to obtain a postponement. An award shall not be made solely on the default of a Party. The arbitrator shall require any Party who is present to submit such evidence as the arbitrator may require for the making of an award.

12

### 19. Evidence

A. The arbitrator shall be the sole judge of the relevancy, materiality, and admissibility of evidence offered. Conformity to legal rules of evidence shall not be necessary.

B. The arbitrator may subpoena witnesses or documents at the request of a Party or on the arbitrator's own initiative.

C. The arbitrator may consider the evidence of witnesses by affidavit or declaration, but shall give it only such weight as the arbitrator deems appropriate after consideration of any objection made to its admission.

### 20. Post-Hearing Submissions

All documentary evidence to be considered by the arbitrator shall be filed at the hearing unless the arbitrator finds good cause to permit a post-hearing submission. All Parties shall be afforded an opportunity to examine and comment on any post-hearing evidence. The arbitrator shall permit the filing of post-hearing briefs at the request of a Party and shall determine the procedure and timing of such filings.

### 21. Closing and Reopening of Proceedings

A. When the arbitrator is satisfied that the record is complete, including the submission of any post-hearing briefs or documents permitted by the arbitrator, the arbitrator shall declare the proceeding closed.

B. The proceeding may be reopened on the arbitrator's initiative or upon application of a Party at any time before the award is made.

### 22. Waiver of Procedures

Any Party who fails to object in writing, after knowledge that any provision or requirements of these procedures and Rules have not been complied with, shall be deemed to have waived the right to object.

### 23. Service of Notices and Papers

Any papers, notices, or process necessary or proper for the initiation or continuation of any proceeding under these Rules (including the

13

award of the arbitrator, any court action in connection therewith, or the entry of judgment on an award made under these procedures) may be served on a Party by mail addressed to the Party or his or her representative at the last known address or by personal service. AAA, JAMS, CPR, the Parties, and the arbitrator may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give any notices required by these Rules.

24. **Communications with the AAA, JAMS, CPR and the Company**

   A. Any Party may notice, serve or communicate with AAA by contacting:

   Regional Administrator
   American Arbitration Association
   1001 Fannin St., Suite 1005
   Houston, Texas 77002
   (713) 739-1302
   Fax: (713) 739-1702

   B. Any Party may notice, serve or communicate with JAMS by contacting:

   JAMS
   345 Park Avenue
   8th Floor
   New York, NY 10154
   (212) 751-2700
   Fax: (212) 751-4099

   C. Any Party may notice, serve or communicate with CPR by contacting:

   Center for Public Resources
   366 Madison Avenue
   New York, NY 10017-3122
   (212) 949-6490
   Fax: (212) 949-8859

   D. Any Party may notice, serve or communicate with the Company by contacting:

   Dispute Resolution Program
   Administrator
   The Halliburton Company
   4100 Clinton Drive
   Houston, Texas 77020-6299
   (713) 676-5383
   Fax: (713) 676-4470

14

25. **Communication with the Arbitrator**

   There shall be no communication between the Parties and the arbitrator other than at any oral hearings or conferences. Any other oral or written communications from the Parties to the arbitrator shall be directed to the AAA, JAMS, or CPR (and copied to the Parties) for transmission to the arbitrator, unless the Parties and the arbitrator agree otherwise.

26. **Time of Award**

   The award shall be promptly made by the arbitrator, unless otherwise agreed by the Parties or specified by applicable law, no later than thirty (30) days from the date of the closing of the proceeding or, if applicable, the closing of a reopened proceeding.

27. **Form of Award**

   The award shall be in writing and shall be signed by the arbitrator. The arbitrator shall write a statement of reasons for the award if requested to do so in the request to initiate proceedings or in the answering statement. The award shall be executed in any manner required by applicable law.

28. **Modification of Award**

   On order of a court of competent jurisdiction, or on agreement of the Parties, the arbitrator shall modify any award. The arbitrator may modify an award on the motion of a Party if the arbitrator finds that the award, as rendered, is ambiguous or defective in form, or if the award requires an illegal or impossible act. These are the only circumstances under which an arbitrator shall have jurisdiction to withdraw or modify an award.

29. **Settlement**

   If the Parties settle their Dispute during the course of the arbitration, the arbitrator may set out the terms of the settlement in a consent award.

30. **Scope of Arbitrator's Authority**

   The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law including that related

15

to the allocation of the burden of proof as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief which is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Plan and Rules.

**31. Judicial Proceedings and Exclusion of Liability**

A.   Neither AAA, JAMS, CPR, nor any arbitrator is a necessary Party in any judicial proceedings relating to proceedings under these Rules.

B.   Neither AAA, JAMS, CPR, nor any arbitrator shall be liable to any Party for any act or omission in connection with any proceedings within the scope of these Rules.

C.   Any court with jurisdiction over the Parties may compel a Party to proceed under these Rules at any place and may enforce any award made.

D.   Parties to these Rules shall be deemed to have consented that judgment upon the award of the arbitrator may be entered and enforced in any federal or state court having jurisdiction of the Parties.

E.   Initiation of, participation in, or removal of a legal proceeding shall not constitute waiver of the right to proceed under these Rules.

F.   Any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under these Rules.

**32. Fees and Expenses**

A.   The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.

B.   All attorney's fees shall be borne by the Party incurring them except as otherwise provided by law, by the Plan, or in the award of the arbitrator.

16

C.   Discovery costs (e.g., court reporter fees for original transcripts) shall be borne by the Party initiating the discovery. The cost of copies of deposition transcripts or other discovery shall be borne by the Party ordering the copy.

D.   The fees and expenses of experts, consultants and others retained or consulted by a Party shall be borne by the Party utilizing those services.

E.   The Employee or Applicant shall pay a $50 fee if he or she initiates arbitration or mediation.  Otherwise, Employee/Applicant Parties shall not be responsible for payment of fees and expenses of proceedings under these Rules including required travel of an arbitrator or a mediator, expenses of an arbitrator, mediator, AAA, JAMS, or CPR, and the cost of any proof produced at the discretion of an arbitrator.

F.   If the demand for mediation or arbitration is initiated by the Company, such fees will be paid by the Company.

G.   Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

**33. Interpretation and Application of These Rules**

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. All other rules shall be interpreted and applied by the AAA, JAMS, or CPR.

**34. Applicable Law**

A.   Proceedings under these Rules and any judicial review of awards shall be governed by the Act.

B.   Except where otherwise expressly provided in these Rules, the substantive law applied shall be state or federal substantive law which would be applied by a United States District Court sitting at the place of the proceeding.

17

**35. Mediation**

At any time before the proceeding is closed, the Parties may agree to mediate their dispute by notifying AAA, JAMS, or CPR. AAA, JAMS, or CPR shall determine what procedures apply to any such mediation.

**APPENDIX**

---

# THE OMBUDSMAN ASSOCIATION

---

### *Code of Ethics*

*The ombudsman, as a designated neutral, has the responsibility of maintaining strict confidentiality concerning matters that are brought to his/her attention unless given permission to do otherwise. The only exceptions, at the sole discretion of the ombudsman, are where there appears to be imminent threat of serious harm.*

*The ombudsman must take all reasonable steps to protect any records and files pertaining to confidential discussions from inspection by all other persons, including management.*

*The ombudsman should not testify in any formal judicial or administrative hearing about concerns brought to his/her attention.*

*When making recommendations, the ombudsman has the responsibility to suggest actions or policies that will be equitable to all Parties.*

©The Ombudsman Association 1987

Reprinted with permission of
The Ombudsman Association

18

19

# THE OMBUDSMAN ASSOCIATION
# STANDARDS OF PRACTICE
© 1995

The mission of the organizational ombudsman is to provide a confidential, neutral and informal process which facilitates fair and equitable resolutions to concerns that arise in the organization. In performing this mission, the ombudsman serves as an information and communication resource, upward feedback channel, advisor, dispute resolution expert and change agent.

### While serving in this role:

**1.** We adhere to The Ombudsman Association Code of Ethics.

**2.** We base our practice on confidentiality.

**2.1** An ombudsman should not use the names of individuals or mention their employers without express permission.

**2.2** During the problem-solving process an ombudsman may make known information as long as the identity of the individual contacting the office is not compromised.

**2.3** Any data that we prepare should be scrutinized carefully to safeguard the identity of each individual whose concerns are represented.

**2.4** Publicity about our office conveys the confidential nature of our work.

**3.** We assert that there is a privilege with respect to communications with the ombudsman and we resist testifying in any formal process inside or outside the organization.

**3.1** Communications between an ombudsman and others (made while the ombudsman is serving in that capacity) are considered privileged. Others cannot waive this privilege.

**3.2** We do not serve in any additional function in the organization which would undermine the privileged nature of our work (such as compliance officer, arbitrator, etc.)

**3.3** An ombudsman keeps no case records on behalf of the organization. If an ombudsman finds case notes necessary to manage the work, the ombudsman should establish and follow a consistent and standard practice for the destruction of any such written notes.

**3.4** When necessary, the ombudsman's office will seek judicial protection for staff and records of the office. It may be necessary to seek representation by separate legal counsel to protect the privilege of the office.

**4.** We exercise discretion whether to act upon a concern of an individual contacting the office. An ombudsman may initiate action on a problem he or she perceives directly.

**5.** We are designated neutrals and remain independent of ordinary line and staff structures. We serve no additional role (within an organization where we serve as ombudsman) which would compromise this neutrality.

**5.1** An ombudsman strives for objectivity and impartiality.

**5.2** The ombudsman has a responsibility to consider the concerns of all Parties known to be involved in a dispute.

**5.3** We do not serve as advocates for any person in a dispute within an organization; however, we do advocate for fair processes and their fair administration.

**5.4** We help develop a range of responsible options to resolve problems and facilitate discussion to identify the best options. When possible, we help people develop new ways to solve problems themselves.

**5.5** An ombudsman should exercise discretion before entering into any additional affiliations, roles or actions that may impact the neutrality of the function within the organization.

20

21

**5.6**  We do not make binding decisions, mandate policies or adjudicate issues for the organization.

**6.**  We remain an informal and off-the-record resource. Formal investigations - for the purpose of adjudication - should be done by others. In the event that an ombudsman accepts a request to conduct a formal investigation, a memo should be written to file noting this action as an exception to the ombudsman role. Such investigations should not be considered privileged.

**6.1**  We do not act as agent for the organization and we do not accept notice on behalf of the organization. We do always refer individuals to the appropriate place where formal notice can be made.

**6.2**  Individuals should not be required to meet with an ombudsman. All interactions with the ombudsman should be voluntary.

**7.**  We foster communication about the philosophy and function of the ombudsman's office with the people we serve.

**8.**  We provide feedback on trends, issues, policies and practices without breaching confidentiality or anonymity. We identify new problems and we provide support for responsible systems change.

**9.**  We keep professionally current and competent by pursuing continuing education and training relevant to the ombudsman profession.

**10.**  We will endeavor to be worthy of the trust placed in us.

Reprinted with permission of
The Ombudsman Association

22

American Arbitration Association
Employment Arbitration Tribunal

| | | |
|---|---|---|
| Halliburton Energy Services, Inc. | § | |
| | § | |
| Claimant, | § | |
| | § | |
| | § | |
| vs. | § | No. 71 480 00074 06 |
| | § | |
| Chester Shane McVay | § | |
| | § | |
| | § | |
| Respondent | § | |

**FINAL AWARD**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Employment Agreement entered into by the above-named parties, and having been duly sworn and having duly heard the proofs and allegations of the parties, AWARD as follows:

## I.   Introduction

This matter was heard before Karen K. Fitzgerald on December 11-14, 2006 at the offices of the American Arbitration Association and on December 29, 2006 at the offices of Kleiman Lawrence Baskind Fitzgerald LLP in Dallas, Texas.  Claimant Halliburton Energy Services, Inc. ("HES") attended and was represented by John Booth, Peter Schroeder and Jeffrey Hellberg.  Respondent Chester Shane McVay ("McVay") attended and was represented by Gregory Clift.

After presentation of the evidence, both parties submitted post-hearing briefs, responses and replies.  The arbitration was closed on February 20, 2007.

## II. Issues Presented

## 1.   HES Claims against McVay

HES filed this arbitration proceeding on January 17, 2006.  The claim or relief sought in the original filing was "Declaratory Findings/Damages/Return of Property/Further relief as necessary."  HES amended its statement of claims against McVay to include the following claims:

1)   breach of the Intellectual Property Agreement, and
2)   breach of the agreement to arbitrate.

**Award**

**Page 1**

During the arbitration, HES sought to add a claim for the tort of misappropriation of trade secrets, but leave to amend was denied.

The ultimate relief sought by HES in this arbitration is:

1)      return of HES property from McVay,

2)      compensation for injuries HES suffered as a result of McVay's various breaches of the IPA;

3)      reasonable attorneys fees incurred in protecting its property and pursuing its claims and litigating the declaratory judgment claims.  HES contends that the reasonable fees are $800,000 and expenses are $100,000;

4)      a permanent injunction insuring McVay's compliance with the IPA.

## 2.    McVay's Counterclaims against HES

McVay asserts the following two claims against HES in his Amended Answer and Counterclaim filed June 30, 2006:

1)      malicious prosecution; and
2)      a declaratory relief action.

McVay's declaratory judgment action seeks a declaration on (i) whether HES possesses valuable confidential information and whether it is legally confidential and proprietary, and (ii) that McVay is the rightful owner of the standard industry software program.  McVay's claim for the standard industry software program includes a claim for the standard industry software program that includes packer-specific applications (referred to in the proceeding and in this Award as the "November 2004 Software").

The relief ultimately sought by McVay was:

(1)      to have the arbitrator award McVay all rights to the software designated as the November 2004 version with the pipe body calculator removed;

(2)      enter a judgment on McVay's malicious prosecution counterclaim and declaratory judgment counterclaims in McVay's favor; and

(3)      award attorneys fees of $120,000 to $130,000 on the malicious prosecution action and $48,000 to $55,000 for the declaratory judgment actions.

## III.    Factual Background

McVay began working for HES on January 15, 2001.  When McVay began working for HES, he executed an Intellectual Property Agreement ("IPA").  The IPA

addresses issues concerning patents, trade secrets, confidential information and copyrights.

McVay advised HES that he was voluntarily resigning his position on January 3, 2006. McVay desired January 15, 2006 to be his last day of employment, but indicated that, due to a previously scheduled vacation, his last day in the office would be January 4, 2006.

McVay had accepted a job position with Caterpillar in Iowa on November 18, 2005 and was to start his new job on January 9, 2006.

Before announcing his resignation, McVay copied over 1 gigabyte of data from his office computer to a thumb drive. McVay made multiple trips to HES headquarters during the weekend before he announced his resignation to copy material from his office computer to a thumb drive. This material was uploaded on to McVay's personal computer at his home. McVay had also sent HES material to his home computer earlier by forwarding emails to his personal Yahoo! account.

Prior to announcing his resignation, McVay also printed out and removed hundreds of pages of HES documents.

On January 3, 2006, McVay had an exit interview. This meeting was attended by McVay, Daryl Stanaway, Bill Imwallee, and Gary Ellis. During the exit interview, McVay was read a copy of the IPA and asked to return all documents (including electronic files) in his possession. He was told that he needed to turn in the documents by the last date of employment and told to give the material to Gary Ellis. In regard to the return of electronic files, McVay was to give a copy of the electronic files to Gary Ellis and then delete all copies off of his personal computers.

McVay was also given an Acknowledgment and Agreement and asked to sign it. McVay, uncomfortable about being asked to sign the Acknowledgement and Agreement, refused to sign it until he could have legal counsel review it. The HES employees were left with the impression that McVay was represented by legal counsel at that time, even though he was not.

During this January 3rd meeting, McVay claimed ownership to a software program. HES was surprised by this claim of McVay's that McVay owned the software program.

During the exit interview, there was also brief discussion of McVay continuing to work on a project for HES to complete it. McVay testified that he believed, at the end of the meeting, that HES was still considering whether it wanted to work with him in some way so that McVay could complete the remaining design standards. Bill Imwallee testified that it was clear during the exit interview that McVay would not be able to devote the time required to complete the project and that, by the end of the meeting, it was no longer being considered as an option.

Award
Page 3

Imwallee requested to have another meeting with McVay (and his counsel) on January 4, 2006, but McVay refused to attend a meeting with Imwallee. During a conversation with his supervisor that day, McVay indicated that he would not return any HES documents that he "may or may not have" until he first visited with counsel.

HES advised McVay that, since January 4, 2006 was his last day in the office, it would also be his last day of employment with HES. On January 4, 2006, McVay also prepared an email that indicated that, under the circumstances, he would no longer be able to perform work for HES after 5 p.m. that day. (RX 76).

McVay left the office on January 4, 2006 and was preparing to leave town to participate in a wedding in Indiana and begin his new job in Iowa on January 9, 2006.

HES was concerned that McVay possessed confidential or trade secret information because of his conduct in the exit interview and his claim to own software. HES filed a lawsuit and obtained a Temporary Restraining Order. This TRO prevented McVay from removing any documents or items belonging to HES from the state and giving McVay approximately 5 days to turn the materials over to HES. Because McVay needed to leave town to participate in a wedding, he left his boxes of printed HES documents and his two computer CPU units in Dallas with James Castaneda. McVay then had this material delivered to his counsel's office on January 10, 2006, shortly after he retained counsel.

Although McVay turned over both computer CPU units and all paper copies of HES documents in his possession, McVay took the thumb drive with him to Iowa. It appears that McVay did not advise his counsel of the existence of the thumb drive until late in this litigation. The last items that McVay had downloaded with the thumb drive were his archived emails (a ".pst" file) from HES. McVay had deleted the materials off of the thumb drive. The HES materials could only be viewed on the thumb drive if a special data recovery software program was applied to it. Otherwise, the thumb drive appeared to be empty of content. The thumb drive was not produced or provided to HES for examination until December 2006. Upon examination, HES demonstrated that the thumb drive, although "deleted", still had HES confidential information stored in the unallocated space that could potentially be restored via the use of several off the shelf computer programs.

## IV.   Analysis of Claims

## A. Breach of Contract Claims

## 1.   Breach of the IPA by Refusal to Return HES Documents

It is not disputed at this point that McVay removed confidential documents and electronic files belonging to HES and refused to return the material when requested on January 3 and 4, 2006. McVay contends that the material was not returned because he

**Award**

**Page 4**

needed time to consult counsel to find out what he was obligated to return and to be given a reasonable amount of time to do so.  When McVay retained counsel on January 10, 2006, McVay turned over five boxes of documents and 2 computer CPU's to his counsel.  McVay turned over the Yahoo! emails to his counsel shortly after that date.  McVay did not, however, disclose the existence of the thumb drive to HES or turn the thumb drive over to his counsel until shortly before the arbitration hearing in December 2006.

HES contends that McVay breached the IPA by initially refusing to return the materials on January 3 and 4.  HES also contends that McVay commits an ongoing breach of the IPA since the property is still in McVay's counsel's office—and not in HES's possession.  HES also expresses concerns about the fact that its confidential material remains on McVay's hard drives, accessible at least by computer forensics experts.

McVay contends that he cannot be found to have breached the IPA for two reasons.  First, McVay argues that his evidence established that he should be allowed a reasonable amount of time to return the material and the right to seek counsel.  McVay contends that he was only given from 6 p.m. on Jan. 4, 2006 until 2:40 p.m. on Jan. 5, 2006 (when he was served with the TRO) to return the material.  To the extent that there was a breach of the IPA, McVay contends that it could only have occurred in that time period.  Second, McVay contends that he cannot be found to have committed an ongoing breach of the IPA since the parties entered into an Agreed Order that authorized McVay's counsel to retain possession of the materials during this litigation and also to utilize the materials as needed to assert claims or defenses in this litigation.

a.    **Initial Breach of the IPA**

McVay correctly points out that McVay did not breach the IPA by having HES materials at his home during his employment because that was an allowed practice.

McVay also introduced evidence that an immediate refusal to return the documents is not necessarily a breach of the IPA.  Even Bill Imwallee testified that an employee would be allowed a reasonable amount of time to gather and return documents.

However, McVay's position that he did not breach the IPA by refusing to return the documents and electronic files while waiting the opportunity to speak with counsel simply was not credible.

McVay may have had some genuine questions about whether *all* of the documents he possessed needed to be returned, but it is inconceivable that McVay would have believed that he could legitimately keep and retain all of the information he removed from HES in both paper copy and electronic files.  McVay took material that was not relevant to the potential need to complete the remaining design standards.  McVay had no legitimate need for the vast majority of those documents.  McVay could

Award                                                                                              Page 5

not have reasonably believed that he would be able to keep all of the documents in his possession. There simply is no legitimate reason for McVay to have done a "wholesale download" of his office computer and believe that he could retain it.

At the time McVay was requested to return the documents, McVay refused until he could seek the advice of counsel. HES offered to meet with McVay and his counsel, but instead of advising HES that he did not yet have counsel, McVay told HES that he would not return any documents he "may or may not have." This conduct, combined with McVay's claim to own the software program, was certainly sufficient to cause HES alarm. Although McVay testified that his remark was a "flip" remark that he later regretted, it was the type of remark that could justifiably alarm HES.

As noted, while McVay may have had a legitimate question as to whether he had to return the documents related to the computer software program in which he claimed ownership, there is no conceivable scenario under which McVay could have understood that all of the materials in his possession did not need to be returned. Furthermore, McVay's excuse that he had taken the documents to complete the remaining design standards is not credible when many of the documents that he retained would have had no relevance to the completion of the remaining design standards.

Thus, I find that McVay has breached the IPA by refusing to return HES property to HES when requested.

### b.   On-Going Breach of the IPA

I find that the fact that HES property is in McVay's counsel's office is not an on-going breach of the IPA. The property has been placed in counsel's office during this litigation pursuant to an Agreed Order signed by Judge Anne Ashby on January 31, 2006. The Agreed Order states that CDH, while it is counsel of record, will hold and possess the documents and tangible things provided to it by McVay. The Order also provides that nothing in the Order prohibits the use of the documents and tangible things in defending or prosecuting this litigation or any other dispute. This Order was agreed to by all parties.

When this order was drafted, HES had to have contemplated that McVay's counsel would need to retain and use at least some of the material in defending this action and in prosecuting its counterclaims. Much of the material is relevant to McVay's counterclaims regarding the ownership of the November 2004 software.

Thus, I find that the possession of the materials in McVay's counsel's office is not an on-going breach of the IPA.

### c.   Return of the HES Material



HES is entitled to the return of its property. The issues of insuring that all the confidential material is returned and wiped off of the hard drives so that it cannot ever be accessed is very difficult. The testimony established that the material deleted off of the hard drives can still be accessed in the unallocated space of the 2 computer CPU's and on the thumb drive. Thus, HES has a legitimate concern about the return of the hard drives to McVay.

McVay, on the other hand, has a legitimate concern about having the CPU's and his personal data contained on those CPU's returned to him.

I find that HES is entitled to an order requiring that all of the documents and electronic files be returned to it. McVay's counsel shall deliver to HES all paper and electronic copies of HES material in McVay's counsel's possession within 10 days of the date of this Award.

However, McVay is entitled to have his personal data that is on the 2 CPU hard drives returned to him. In order to facilitate the return of his personal data, I order that McVay's counsel turn over the 2 CPU hard drives to HES's computer forensics expert within 10 days of this order. HES's expert is ordered to prepare a list of file names and provide it to HES and McVay. McVay will be given 10 days to review this list of files and to identify personal files that he wishes to be copied to a CD-rom or external hard drive. If HES believes that any of the files identified by McVay contain any HES confidential information, HES may object within 5 days of receipt of McVay's list by filing objections with the American Arbitration Association. McVay will have 5 days to respond to HES's objections and the arbitrator will make the final decision as to whether a particular file will be copied. After the files identified by McVay as personal files have been copied on to a CD-rom or external hard drive and given to McVay, the 2 CPU units will be destroyed by HES's forensic computer expert. HES will not be given custody of the 2 CPU units at any time. The thumb drive is also to be turned over to HES's forensic computer expert and destroyed. HES shall bear the expense of this procedure.

## 2.    Breach of IPA by Disclosure to Third Parties

The evidence submitted at the arbitration also established that McVay violated the IPA by disclosing confidential HES information to third parties.

McVay violated the IPA by transmitting the confidential information as follows:

1)    emailing HES documents to the "hytech7" email account
2)    delivering HES confidential documents and his two computer CPU units to James Castaneda ;
3)    conferencing with and having James Castaneda move files on McVay's CPU units.

McVay testified at the arbitration that he did not disclose HES confidential material to anyone. He asserted that he emailed materials to the "hytech7" address so

that he could work on materials when he was visiting his parents in Oklahoma and that he would tell his father not to open these emails. Of course, as HES pointed out, there was no reason McVay could not have emailed those same materials to his Yahoo! email account to access while he was in Oklahoma. In fact, several of the emails were sent to both the Yahoo! email account and the "hytech7" email account.

Prior to the arbitration, McVay testified by affidavit, however, HES had given him permission to disclose information to his father and that HES was fully aware that his father was assisting McVay on certain aspects of the design standards and development of the trapped pressure compensator. (CX 50). In the arbitration, however, McVay testified that his father had not seen any confidential information concerning the design standards.

Both of these things cannot be true. I find that McVay's testimony on this point was not credible.

McVay also delivered the 2 computer CPU units and boxes of hard copy documents to James Castaneda before he left Dallas. Although McVay had an ostensibly legitimate reason for doing so—he needed to attend his uncle's wedding and was trying not to violate the TRO---this is, in fact, an unauthorized disclosure under the IPA and also a violation of the TRO. Furthermore, after McVay delivered the CPU units to Castaneda, he had Castaneda access the files (while McVay as on the telephone) to reorganize the electronic files. Again, this is a disclosure of HES information in violation of the IPA and also a violation of the TRO.

I find that McVay breached the IPA by disclosing confidential HES documents to third parties without authorization of HES.

### 3.    McVay's Affirmative Defenses Do Not Apply

In regard to the claims for the breach of the IPA, McVay asserts that the affirmative defenses of (1) mistake, (2) unconscionability, and (3) ambiguity apply to negate HES's breach of contract claim.

McVay did not meet his burden to establish the applicability of these affirmative defenses. McVay did not show that there was a material provision that made it unconscionable or physically impossible to meet the terms of the IPA. The IPA calls for return of HES property upon request. McVay made no effort to return the property that he had to have known he could not keep upon request.

I further find that the IPA agreement is not unconscionable. The mere fact that it is a form agreement with little ability for McVay to negotiate the terms does not make it either procedurally or substantively unconscionable.

Moreover, I find that the terms of the IPA are not latently ambiguous.

**Award**

**Page 8**

### 4.    Request for Injunctive Relief

McVay was not honest and forthcoming when he left HES. McVay was not honest and forthcoming during much of the litigation leading up to the arbitration hearing. For example, McVay did not disclose.the existence of the thumb drive until shortly before the hearing began in December 2006 and stated in his deposition that he "could not recall" whether he had removed HES property in the weekend before his resignation.

It was only during the hearing that McVay finally provided the real explanation for his actions, McVay testified that he made a large misjudgment---which was that HES would retain him to complete the remaining design standards. That was the first time McVay ever provided any legitimate explanation for why he had made a wholesale download of his office computer, email and taken boxes of HES hard copies. Of course, this explanation does not explain why McVay took items that would not be required for him to complete the remaining design standards.

McVay had ample opportunity to provide this explanation long before the date of the arbitration hearing. It is inconceivable to the arbitrator that he did not even admit to removing confidential material or copying material on the thumb drive during his deposition or prior to the hearing, thus necessitating a large part of the lengthy and complex hearing.

Because of this, I find that HES is entitled to injunctive relief, albeit not the broad relief that HES seeks in its post-hearing brief

Instead, I find that HES is entitled to injunctive relief as follows:

1)    McVay and those acting in concert with him are enjoined from utilizing in any fashion any paper and electronic copies of any documents and tangible things that concern HES products, services or processes;

2)    McVay and those acting in concert with him are ordered to return within 10 days (to the extent not already returned) all paper and electronic copies of all documents and tangible things concerning HES products, services or processes, including but not limited to any such paper or electronic copies delivered by McVay to any third party;

3)    McVay shall, within 10 days of the date of this Award, certify by sworn statement that neither he nor anyone with access to the "hytech7' email address possess or control any electronic copies of documents or things concerning HES products, services or processes;

4)    McVay shall, within 10 days of the date of this Award, certify by sworn statement that no electronic or other copies of any documents or things received at the

"hytech7" address from McVay that concern HES products, services or processes have been provided to any third party or that all such copies have been returned to HES; and

5)      McVay shall, within 10 days of the date of this Award, certify by sworn statement that he has not delivered to anyone outside of HES, other than those with access to the "hytech7" address or James Castaneda, any paper or electronic copies of any version of any documents or records relating to HES products, services or processes.

## B.      Breach of Fiduciary Duty

HES attempted to add a breach of fiduciary duty claim in its Post Hearing Brief. HES seeks disgorgement of McVay's compensation for the period of time that McVay ostensibly violated his fiduciary duty.

However, HES did not plead a breach of fiduciary duty claim. HES did seek to add a claim for the tort of misappropriation of trade secrets during the hearing and its trial amendment was denied. HES did not seek to add a breach of fiduciary duty claim at that time.

While pleadings are interpreted broadly, the claims asserted by HES in its Amended Claim were not sufficient to put McVay on notice that HES would be seeking to assert a breach of fiduciary duty claim against him. Thus, HES is not allowed to seek recovery from McVay pursuant to a breach of fiduciary duty theory.

## C.      Damages

HES requests the following categories of damages:

1)      $1,200 in printing and paper costs caused by McVay's printing out and removing 5 boxes of HES hard copies,

2)      $7,200 as compensation for Ezell's time and expenses incurred in remedial and mitigation efforts to locate and recover HES documents,

3)      $30,000 in attorneys fees incurred in trying to recover documents sent to the "hytech7" email account,

4)      fees of Neville Newman incurred in forensic computer review, including $5,081.75 for forensic review related to the thumb drive and $11,828.52 for forensic searches on the mirror image drives

5)      forfeiture of McVay's compensation

6)      injunctive relief,

7)   attorneys fees of $800,000 and expenses of $100,000.

McVay contends that many of these claimed damages are not "just compensation" for the loss caused by the alleged breach of contract. McVay contends that HES cannot show any actual damages caused by the alleged breach of contract, such as loss of sales, loss of profits, or loss of goodwill.

I agree that the $1,200 in printing costs does not relate to the breach of contract for refusing to return the paper documents. As noted above, I also find that HES is not entitled to disgorgement of McVay's compensation.

McVay contends that HES is not entitled to recover damages for litigation and expert expenses in regard to the breach of contract claim. However, HES points out that it seeks the recovery of these expenses as damages for its remedial and mitigation efforts, not as general litigation and expert fees. HES cites to several cases that allow a plaintiff in a breach of contract action to recover reasonable and necessary mitigation expenses. HES Reply Brief, pp. 29-32. Thus, HES seeks to recover a total of $24,047.27 in mitigation costs.

McVay also contends that the attorneys spent in the Oklahoma action against Leland McVay are not recoverable as damages. HES contends that it is allowed to recover those fees since it was McVay's tort that required HES to act to protect its interests by filing the lawsuit against Leland McVay.

I find that HES is entitled to recover $24,047.27 in mitigation costs. I find that the costs of the attorneys fees for the Oklahoma litigation against Leland McVay are not recoverable.

The issue of attorneys fees is dealt with below.

## D.   McVay Counterclaims

## 1.   Declaratory Judgment Claims

As noted, McVay's declaratory judgment claim has two components. The first component addresses the issue of whether HES possessed valuable confidential information and whether such information is legally confidential and proprietary.

### a)   HES Possession of Confidential Information

This claim can be resolved in short order. The overwhelming evidence is that HES does possess valuable confidential and trade secret information and that HES exercised efforts to protect the confidentiality of its data. The evidence established that McVay knew HES treated the information concerning the packers as confidential and that McVay even took steps to protect the confidentiality of this information during his

employment. McVay even indicated in certain documents that he knew that the operating envelope guidelines were considered a trade secret. (CX 13).

The documents included data and engineering specifications regarding HES packers and performance envelopes. It cannot be seriously contended that this technological information, developed at a large cost by HES, is not confidential and trade secret information. HES took steps to protect the confidentiality of the data by marking each document as confidential in its design standard template—the purpose of which would be to remind each employee that the data is considered confidential and should not be disseminated.

I find that HES possessed confidential and trade secret information.

### b)    Declaratory Judgment Claim regarding Ownership of the Software

The second component of McVay's counterclaim requests a declaration that McVay is the rightful owner of the standard industry software program with the packer modifications. As McVay contends in his Reply to Claimant's Brief and Response to McVay's Post-Hearing Brief, this arbitration is "about the October 2003 computer program with substantive Visual Basic code and its slight modifications that resulted in what has been called the November 2004 program." (Reply, p. 16). This November 2004 software program is a packer specific program.

McVay contends that he is the owner of the software because he is the author of the work. McVay also argues that the November 2004 software is not a "work for hire" as defined by the Copyright Act.

McVay argues that the November 2004 software is not covered by any provision of the IPA except, arguably one paragraph of the IPA. For purposes of this Award, that paragraph is referred to as Paragraph 6.

HES contends that various provisions of the IPA, including paragraph 6, govern ownership of the November 2004 software and require the conclusion that HES is the owner of the software.

I find that Paragraph 6 of the IPA expressly covers this issue. This provision states:

> **In the performance of his/her duties as an employee of Halliburton, the undersigned may develop or assist in the development of computer programs** or another works of authorship as defined in the Copyright Act of 1976, 17 U.S.C. section 102 (hereinafter referred to as "WORK"). **Any original work of authorship** fixed in any tangible medium of expression **which the undersigned creates as a Company employee shall be considered a work made for hire** pursuant to the copyright laws of the United States. Upon completion of any WORK, and upon payment

of any sums due to the undersigned, Halliburton shall have the sole and exclusive right, title and interest (including trade secret and copyright interests) in such WORK.  The undersigned hereby agrees to assign, and for no further consideration does assign, to Halliburton all of his/her worldwide right, title and interest in and to such WORK, including trade secret and copyright interests.  The undersigned agrees to assist Halliburton and its nominee, at any time, in the protection of Halliburton's worldwide right, title and interest in and to the works and all rights of copyright therein, including but not limited to, the execution of all formal assignment documents requested and prepared by Halliburton or its nominee and the execution of all lawful oaths and applications for registration of copyright in the Untied States and foreign countries.

(Emphasis added).  I find that paragraph 6 of the IPA is dispositive of this issue.

The crux of this issue comes down to whether McVay, "in the performance of his/her duties as an employee of Halliburton," developed the computer program and created the program "as a Company employee."

If he did so, then Paragraph 6 governs.

The original standard industry software program developed by McVay was done on his own time in the evenings at his house. McVay never shared this program with HES.  McVay introduced evidence that he was originally instructed not to work on the program. When McVay was originally working on the standard industry software program, he was not doing so as part of his job duties.

The evidence established, however, that over time, McVay did begin to work on the software as part of his job duties.  He shared it with HES and made changes and modifications to it as instructed or requested by HES.  It is this final version---that contains modifications and requests by HES---to which McVay seeks ownership. Certainly, by the October 2003 and the November 2004 versions, McVay had presented the software program to the department for use by other at HES and was being asked to make modifications to the program for use at work.

I find that the November 2004 software versions was created by McVay as a company employee for purposes of the IPA. McVay was paid for this work by his regular salary and also the MVP award he received for his work The following evidence supports this finding:

·        McVay's 2003 PPR assigned McVay the task of creating an automated Von Mises spreadsheet in Microsoft Excel for use as a standard when establishing operating envelope files (CX 12)

·        McVay made changes to the program in 2003 and 2004 as a result of instructions from Gary Ellis (CX 42)

**Award**                                                              **Page 13**

·    McVay was working regularly on the program and presenting it to HES for use and obtaining comments and making modifications on it based on those comments in 2003 and 2004.  (CX 30, 31, 40, 42, 62).[1]

·    By 2004, an RTA had been assigned to this project.  (CX 16, tab 11).

Because the IPA governs this situation, it is not necessary to analyze the various cases citing the work for hire doctrine.  However, even if the IPA did not apply, I find that the work performed by McVay falls under the work for hire doctrine and is most analogous to the case of *Miller v. CP Chemicals*, 808 F.Supp. 1238 (D.S.C. 1992).  In *Miller,* the court found that a computer program drafted by an hourly employee at his home and on his own time fell within the scope of the work for hire doctrine.  The court found that the development of computer programs was "at least incidental" to the employee's job responsibilities.  Furthermore, it found that the development of the computer program was actuated, at least in party, by a purpose to serve the employer.  *Miller*, 808 F.Supp. at 1243-44.

The same criteria apply in this case.  While McVay was hired as an engineer and not a computer programmer, the development of the computer program was at least incidental to his engineering job duties as it was designed to enable him to perform the packer performance envelope calculations more quickly and more accurately.  Furthermore, the evidence introduced showed that McVay's development of the program was motivated by a desire to make his job easier and to improve the ability of HES to do the packer performance envelope calculations. (CX 62).   McVay agreed in his PPR that his performance should be measured, at least in part, by his ability to complete this project.  (CX 12).  McVay expressed his desire that this program be made available to all at HES.  (CX 21).

I find that the case of *Roeslin v. District of Columbia*, 921 F.Supp. 793 (D.D.C. 1995) is distinguishable.  The evidence in that case was the employee was motivated to develop the computer program to develop job opportunities for himself and to prove that it could be done.  While McVay is a talented engineer who also desired to prove his abilities, I find that McVay's actions were motivated, at least in part, to serve his employer.  Thus, the work for hire standard is met.

Thus, I find that HES is the owner of the November 2004 software program.  All rights, title and interest in the November 2004 software program were assigned to HES by virtue of the IPA.  To the extent that any additional assignments are required to effectuate HES's ownership interests and copyright interests in the November 2004 software, McVay is ordered to execute within 30 days of the date of this order an appropriate assignment.

---

[1]   HES referred to CX 41 several times in its briefing as evidence that McVay was working full time on the spreadsheet.  The Arbitrator does not have a copy of CX 41 and it was not admitted into evidence at the hearing.  Thus, the references to CX 41 have not been considered for purposes of this Award.

## 2.    Malicious Prosecution Counterclaim

McVay is not entitled to recovery on his counterclaim for malicious prosecution. An essential element of a malicious prosecution claim is that the proceeding be terminated in McVay's favor.  These claims have not been terminated in McVay's favor. Thus, McVay cannot recover on his malicious prosecution counterclaim.

## E.    Recovery of Attorneys Fees

HES seeks to recover its reasonable and necessary attorneys fees pursuant to its breach of contract claim and also pursuant to the  Declaratory Judgment Act.  The Declaratory Judgment Act provides that a court "may" award reasonable and necessary attorneys fees as are equitable and just.  Tex. Civ. Prac. & Rem. Code § 37.009.  Under Tex. Civ. Prac. & Rem. Code § 38.001, HES can recover attorneys fees on a claim for breach of an oral or written contract.

The usual and customary attorneys fees for similar cases are presumed to be reasonable, but this presumption can be rebutted.    Tex. Civ. Prac. & Rem. Code § 38.003.  A court may take judicial notice of the usual and customary fees in like cases and of the contents of the case file and the court may determine the amount of the fee without receiving further evidence. Tex. Civ. Prac. & Rem. Code  § 38.004.

The same rules do not apply to the Declaratory Judgment Act.  A party seeking to recover attorneys fees in a declaratory judgment action must prove that the fees sought are reasonable and necessary.  The party does not receive the presumption of reasonableness nor the availability of judicial notice which is available under Tex. Civ. Prac. & Rem. Code § 38.001 *et. seq.  Gorman v. Gorman*, 966 S.W.2d 858, 866-67 (Tex. App.---Houston [1st Dist.] 1998, pet. denied).  A trial court is not permitted to take judicial notice of reasonable and necessary attorneys fees under the declaratory judgment act. *Id*.

McVay contends that HES is not entitled to recover any attorneys fees for its breach of contract claim because HES did not have "recoverable damages."  However, HES did establish a breach of the IPA by McVay, did establish that it had some recoverable damages and also established that it was entitled to an injunction.  I find that HES is entitled to the recovery of attorneys fees under Tex. Civ. Prac. & Rem. Code 38.001.  I find that HES has fulfilled the conditions precedent to recovery of fees.

The evidence submitted by HES is not sufficient, however, to support an award of fees and expenses in the amounts requested.  HES contends that its reasonable and necessary attorneys fees were $800,000 and its expenses were $100,000.  The evidence supporting HES's claim for attorneys fees includes the testimony of Bill Imwallee during the hearing, the affidavit of Peter V. Schroeder, and redacted fee statements from Crutsinger & Booth ("C&B").

A determination of reasonable attorneys fees is a question for the trier of fact and the amount of a fee award rests in the sound discretion of the trial court. *See Cordova v. Southwestern Bell Yellow Pages, Inc.*, 148 S.W.3d 441, 445 (Tex. App.—El Paso 2004, no pet). The factors that go into judging the reasonableness of attorneys fees are set forth in *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 819 (Tex. 1997). These factors include the following:

1)   the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

2)   the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

3) ·   the fees customarily charged in the locality for similar legal services;

4)   the amount involved and the results obtained;

5)   the time limitations imposed by the client or the circumstances;

6)   the nature and length of the professional relationship with the client;

7)   the experience, reputation, and ability of the lawyer or lawyers performing the services; and

8)   whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*See Arthur Anderson*, 945 S.W.2d at 818.

McVay correctly objects to the C&B fee statements.[2]  The fee statements are so overly redacted that it is impossible to tell (1) what tasks were completed, (2) who worked on the tasks and (3) how much time was spent on each task.[3]  Furthermore, the fee statements submitted were only through November 22, 2006 and totaled only $243,941.20 in fees and $48,150.81 in expenses.  HES did not submit any fee statements reflecting work performed after that date.  Although it is expected that the fee statements would have some redactions to protect privileged information, these fee statements are almost entirely redacted.  Furthermore, given the significant amount of post-hearing briefing done by the parties, it is not clear why no fee statements for time

---

[2]  HES contends that McVay should have filed a motion to compel if it believed the fee statements produced by HES were not proper.  However, HES is mistaken.  HES bears the burden of proving that its fees are reasonable and of showing the work performed.  These fee statements simply do not do that since all pertinent information is redacted.

[3]  HES did not redact the time for each task and rate on all of the fee statements.  This information is shown for fee statements before October 25, 2006.  However, the narrative of each task is redacted so thoroughly that it is impossible to tell what work was performed.  For the fee statements after October 25, 2006, almost all relevant information is redacted.

**Award**

**Page 16**

spent after November 22, 2006 were submitted to the arbitrator. The fee statements, as submitted, have little or no value as evidence to support the claimed fees.

Bill Imwallee testified during the hearing that HES had incurred attorneys fees of approximately $300,000 to $400,000 for this litigation, which did not include the fees incurred during the week of the arbitration hearing. Imwallee also testified that HES had incurred approximately $60,000 in computer forensic expenses. Imwallee's testimony did not segregate the fees between the various claims asserted.

Peter Schroeder's affidavit cites to the AIPLA, Report of the Economic Survey which lists average attorneys fees rates per hour, by years of attorney experience and average litigation costs and fees for various types of intellectual property litigation. According to this affidavit, the average cost for a copyright case through trial is $494,000 when there is less than $1 million in dispute and $1.15 million when the dispute involves more than $ 1 million. McVay did not object to this evidence in Schroeder's affidavit.

Schroeder's affidavit also cites the various factors under Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct and offers his opinion as to the reasonable and necessary fee for the professional services of Crutsinger & Booth in this matter. Schroeder opines that the reasonable attorney fee is $800,000 and the reasonable expenses incurred are $100,000. Schroeder's affidavit did not segregate the fees between the various claims.

The evidence introduced by McVay is that his attorneys fees were far lower than those of HES. McVay requested and introduced evidence that he had incurred $120,000 to $130,000 as damages for the malicious prosecution claim and $48,000 to $55,000 as fees for McVay's declaratory judgment action. McVay supported this evidence with the Statement of Gregory Clift and attached fee statements. McVay noted that he had incurred attorneys fees of $158,765.00 through December 2006 and anticipated another $13,000 to $24,375 in post hearing activity. McVay contended that he had incurred fees of approximately $98,000 in defending the breach of contract claim.

McVay also pointed out that HES utilized multiple lawyers at most hearings and depositions and questioned the need for the participation of so many attorneys at most activities in the case. McVay also objects to HES's evidence because HES failed to segregate its claims for fees among the various causes of action. HES did not segregate the attorneys fees it incurred in pursuing the breach of contract claims from its fees incurred in prevailing on the declaratory judgment counterclaim. However, as HES cites, there is an exception to the segregation requirement when the attorneys fees are incurred in connection with multiple claims arising out of the same transaction and that are so interrelated that their prosecution or defense entails proof or denial of essentially the same set of facts. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991).

**Award**                                                                                    **Page 17**

In this case, however, the facts involved with proving the breach of contract claim were not the same facts that would be involved in proving ownership of the software. In fact, the facts and evidence submitted on the claims for breach of contract were entirely different than the facts and evidence submitted to prove ownership of the software.

The breach of contract issue should have been simple. However, it was certainly complicated by the fact that McVay was not forthcoming about what he had taken in electronic format and uploaded to his computer. Thus, HES had to spend significant efforts in proving that issue and in having computer forensics reviews done of the computer. HES also had to incur significant effort into making sure that it had obtained every source of electronic data. For example, the thumb drive was not disclosed to HES until December 2006. It should have been provided to McVay's counsel in January 2006 after the entry of the TRO. HES also had to expend substantial time proving that the documents contained confidential business information and trade secrets as this was challenged by McVay. This required significant testimony on the nature of the packers produced by HES, the packer performance envelopes, why packer performance envelopes were important and how such data could give an HES competitor a competitive advantage.

The declaratory judgment issue concerning the ownership of the software also required significant efforts since the inception of the various Von Mises calculators prepared by Ellis, Ezell and Baldridge had to be traced. The ownership of this software is a highly significant issue to HES as it involves a highly valuable product that saves HES engineers many hours in calculating packer performance envelopes. This issue was complicated by the fact that the particular software program to which McVay claimed ownership appeared to be a constantly moving target. Thus, all versions of the HES employee spreadsheets (Ellis, Ezell and Baldridge) and the various versions of McVay's spreadsheets (with and without Visual Basic Code included) had to be traced. This was very complicated and took a significant amount of time at the hearing.

As the trier of fact, I am authorized to award attorneys fees based upon the evidence before me and the provisions of Tex. Civ. Prac. & Rem. Code § 38.004. The evidence submitted was not as detailed as it should have been. It is also concerning to me that HES used multiple lawyers for depositions and hearings. Thus, I do not believe the amount of fees requested by HES is supported by the evidence or is reasonable and necessary.

Based on the evidence before me and taking judicial notice of the matter as allowed by Tex. Civ. Prac. & Rem. Code § 38.004, I find that HES is entitled to recover attorneys fees of $150,000 for the breach of contract claim.

However, the evidence submitted by HES is not sufficient to support an award of attorneys fees on the Declaratory Judgment Claim. The evidence submitted by HES does not segregate or prove up the reasonable fees incurred on the declaratory judgment claim. I am not permitted to take judicial notice of reasonable and necessary

fees under the Declaratory Judgment Act. *Gorman*, 966 S.W.2d at 866-67.  Thus, HES is not entitled to an award of attorneys fees on the declaratory judgment claim.

HES also sought to recover its costs and expenses of $100,000.  Exhibit B to Peter Schroeder's Affidavit contains evidence concerning HES's expert costs.  Two of the invoices included in Exhibit B are the same expenses for which HES sought and received recovery as mitigation damages on the breach of contract claim.  Thus, HES is not entitled to a double-recovery on those invoices.  The remainder of the invoices submitted total $20,944.15.  HES did not submit any other evidence concerning the actual vendor costs it incurred in collecting, scanning and producing the electronic discovery, bates labeling the document production, court reporter fees for depositions. The C&B fee statements that show Disbursements and Costs do not identify the disbursements at issue.  Thus, I find that the evidence submitted by HES only supports the recovery of $20,944.15 in costs.

## V.     Award

Thus, HES is entitled to the following award and recovery from McVay:

1)      Injunctive Relief against McVay as follows:

a)      McVay and those acting in concert with him are enjoined from utilizing in any fashion any paper and electronic copies of any documents and tangible things that concern HES products or services;

b)      McVay and those acting in concert with him are ordered to return within 10 days (to the extent not already returned) all paper and electronic copies of all documents and tangible things concerning HES products and services, including but not limited to any such paper or electronic copies delivered by McVay to any third party;

c)      McVay shall, within 10 days of the date of this Award, certify by sworn statement that neither he nor anyone with access to the "hytech7' email address possess or control any electronic copies of documents or things currently held by McVay's counsel;

d)      McVay shall, within 10 days of the date of this Award, certify by sworn statement that no electronic or other copies of any documents or things received at the "hytech7" address from McVay that concern HES products, services or processes have been provided to any third party or that all such copies have been returned to HES; and

e)      McVay shall, within 10 days of the date of this Award, certify by sworn statement that he has not delivered to anyone outside of HES, other than those with access to the "hytech7" address or James Castaneda, any paper or

electronic copies of any version of any documents or records relating to HES products, services or processes.

2)      Damages for breach of contract in the amount of $24,047.27;

3)      a declaratory judgment that HES is the owner of the November 2004 software program and that all right, title and interest in the November 2004 software program were assigned to HES by virtue of the IPA;

4)      Reasonable and necessary attorneys fees of $150,000 for pursuit of the breach of contract claim;

5)      Expert witness costs of $20,944.15.

I further find that McVay is entitled to a take nothing judgment on his malicious prosecution counterclaim and on his declaratory judgment counterclaims.


The administrative fees and expenses of the American Arbitration Association and the compensation and expenses of the arbitrator shall be borne in accordance with the provisions of the personnel manual or employment agreement.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are, hereby, denied.


Dated: _March 21, 2007_

_Karen K. Fitzgerald_
Karen K. Fitzgerald

**Award**                                                                                   **Page 20**

## Stacey Coe

**From:** Karen Fitzgerald [Karen@KLBF.COM]

**Sent:** Saturday, January 27, 2007 12:53 PM

**To:** Stacey Coe

**Subject:** AAA No. 71 0480 00074 06; Halliburton Energy Services, Inc. v. Chester McVay

> [x] Right-click here to download pictures. To help protect your privacy, Outlook
> prevented automatic download of this picture from the Internet.
> Kleiman Lawrence Baskind Fitzgerald LLP

Stacey:

I just realized that I need to make a supplemental disclosure in regard to this case.

I learned today that one of my neighbors, Sam Crutsinger, is the son of John Booth's partner, Peter Crutsinger.  Mr. Booth is the lead counsel for Halliburton.  I have lived in my current residence since May 2004, but did not meet my neighbor, Sam Crutsinger, until one evening in November 2006.  On that particular evening, there was an incident in Deep Ellum and the Dallas SWAT team required all of the residents in our particular block to clear their residences while the police department handled this incident.  Mr. Crutsinger lives next door to the residence involved in the incident and my husband and I live two doors away.  We met Mr. Crutsinger that night while we were waiting outside our homes.  I only learned his first name of "Sam" that evening.

I have talked with him one other time since that evening, but my husband has picked up mail for Sam when Sam has been out of town and has exchanged emails with Sam.  In one of his emails to my husband (sent on 1/26/07), Sam made a remark about my husband being a former lawyer and mentioned that his father was Peter Crutsinger with the law firm of Crutsinger & Booth. That is the first time I learned Sam's last name and that his father was a partner of John Booth.

I do not believe that this disclosure will affect my impartial service as an arbitrator in any way, but did want to make the disclosure out of an abundance of caution.

Please let me know if you have any questions about this supplemental disclosure.

Regards,
Karen Fitzgerald

214.265.9958 (direct dial)
karen@klbf.com
Board Certified—Labor & Employment Law—Texas Board of Legal Specialization

This email and any attachments are intended solely for the addressee(s) and may contain confidential and/or legally privileged information.  If you are

1/29/2007

**Gregory M. Clift**

---

**From:**     Peter Schroeder [pschroeder@ipoftexas.com]
**Sent:**     Tuesday, March 06, 2007 8:25 PM
**To:**       coes@adr.org
**Cc:**       Gregory M. Clift
**Subject:** HES v. McVay, 710480 00074 06

HES v. McVay
Case no. 710480 00074 06

Stacey:

    Find attached sample injunctive language which might be helpful to the Arbitrator.  Please inquire of the Arbitrator whether she wishes to have such, and if so, please forward the attached to her.  Counsel for McVay is copied on this email.  Thank you.

Peter Schroeder
Crutsinger & Booth, LLC
1601 Elm St., Ste. 1950
Dallas, Texas 75201


:<030607 Proposed Award.doc>>

3/19/2007

## IN THE MATTER OF ARBITRATION BETWEEN

| | | |
|---|---|---|
| HALLIBURTON ENERGY SERVICES, INC., | § § § | AMERICAN ARBITRATION ASSOCIATION |
| vs. | § § | CASE NO. 710480 00074 06 |
| CHESTER MCVAY | § § | |

### [Proposed] ARBITRATOR'S AWARD

The undersigned Arbitrator, having considered the pleadings, evidence, testimony, arguments of counsel, and post-hearing briefing, including the respective case presentations on December 11, 12, 13, 14 and 29, 2006, by Claimant Halliburton Energy Services, Inc. ("HES") and Respondent Chester McVay ("McVay"), hereby enters this Award in favor of HES and against McVay under the Rules of the American Arbitration Association ("AAA") as set forth herein and as supported by the findings of fact and conclusions of law recited below:

#### FINDINGS OF FACT

This Award is based upon and supported by the competent evidence and testimony presented to the Arbitrator, which includes and support the following findings of fact:

1. HES is a corporation whose business includes the design and manufacture of down hole well tools including packers, tubing pressure compensators, fiber optics; and related products.

2. HES has developed and owns valuable trade secrets and confidential information relating to down hole well tool business, including without limitation the stress experienced by its packer products under various conditions.

3. McVay was employed by HES as and engineer from January 15, 2001 to January 3, 2006, inclusive, during which time McVay had access to HES' valuable trade secrets and confidential information.

4. As a condition of his employment with HES, McVay was required to enter into and did enter into an Intellectual Property Agreement (the "IPA") with HES.

5. The IPA is valid and enforceable agreement by and between McVay and HES.

6. McVay materially breached the IPA, which breach included without limitation McVay's failing to return to HES documents of HES upon request of HES and upon McVay's voluntary termination of his employment with HES.

7. McVay materially breached the IPA, which breach included without limitation McVay's use of HES confidential information for himself by copying and transferring electronic files to his home computer on January 1, 2006.

8. A version of the Packer Performance Envelope Calculation Program was first distributed by HES in about November of 2004 (the "2004 Version").

9. The formulas contained in the 2004 Version for calculating the performance of HES packer and related products under well conditions are based on confidential discoveries HES had made regarding operation of the parts of HES products.

10. McVay materially breached the IPA by divulging and disclosing HES confidential information to third persons without the knowledge or consent of HES.

11. The terms of the IPA vest sole ownership in HES of the 2004 Version as an invention made during McVay's employment at HES. The terms of the IPA exclude any valid claim of ownership by McVay in or to all or any part of the 2004 Version.

12. The terms of the IPA vest sole ownership in HES of the 2004 Version as a document made or compiled by McVay while employed by HES concerning packer products, excluding any valid claim of ownership by McVay in or to all or any part of the 2004 Version.

13.   The terms of the IPA vest sole ownership in HES of the 2004 Version as a computer program McVay developed or assisted in the development of in the performance of his duties as an employee of HES, excluding any valid claim of ownership by McVay in or to all or any part of the 2004 Version.

14.   McVay's conduct required HES to act in the protection of its interests by bringing or defending an action against a third party, Leland McVay.

15.   McVay's breach of the IPA caused HES to incur damages, including incurring expenses necessary to mitigating the harm and material potential harm arising from McVay's conduct in breach of the IPA.  $_____ [$24,047.27] represents a recoverable damages award in this case to HES and against McVay.

16.   HES incurred attorneys' fees which are both reasonable and necessary in the prosecution of its claims against McVay and to successfully defend against the counterclaims asserted by McVay.  It was necessary for HES to defend against the counterclaims of McVay in order to prevail and obtain recovery under its claims.  $_____ [$800,000] represents a reasonable and necessary attorneys' fee award in this case to HES and against McVay.

17.   McVay's breached of his fiduciary duty entitling HES to recover and McVay to forfeit compensation for the period of his breach.  $_____ [$8,173] represents an forfeited compensated award in this case to HES and against McVay.

18.   McVay's breach of the IPA caused HES to incur damages, including the costs of paper and printing of materials taken by McVay and expenses incurred in protecting its interests in an action against Leland McVay.  $_____ [$31,200] represents actual damages awarded in this case to HES and against McVay.

19.    To the extent the conclusions of law made below contain in whole or in part findings of fact, those findings are incorporated by referenced and are adopted as if fully set forth herein.

### CONCLUSIONS

Based upon the foregoing findings of fact, the Arbitrator makes for the following conclusions of law:

1.    The Arbitrator has jurisdiction and the contractual agreement of the parties to consider and make determinations on all issued raised by the parties' pleadings filed in this proceeding.

2.    The unambiguous terms of the IPA vest sole ownership in HES of the 2004 Version as an invention made during McVay's employment at HES.  Those unambiguous terms of the IPA exclude any valid claim of ownership by McVay in or to all or any part of the 2004 Version.

3.    The unambiguous terms of the IPA vest sole ownership in HES of the 2004 Version as a document made or compiled by McVay while employed by HES concerning packer products, excluding any valid claim of ownership by McVay in or to all or any part of the 2004 Version.

4.    The unambiguous terms of the IPA vest sole ownership in HES of the 2004 Version as a computer program McVay developed or assisted in the development of in the performance of his duties as an employee of HES, excluding any valid claim of ownership by McVay in or to all or any part of the 2004 Version.

5.    The 2004 Version is a "work for hire" under the provisions of the Copyright Act and, therefore, is owned by HES.