IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CHESTER SHANE McVAY, § | |
| § | |
| Movant, § | |
| § | |
| v. § | CASE NO. 3-07CV1101-M |
| § | |
| HALLIBURTON ENERGY SERVICES, INC., § | |
| § | |
| Respondent. § | |

**MOVANT's REPLY TO RESPONDENT's OPPOSITION TO MCVAY's
MOTION TO VACATE ARBITRATION AWARD AND BRIEF IN SUPPORT**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Chester Shane McVay ("McVay" or "Movant") files this Reply to Respondent's Opposition to McVay's Motion to Vacate Arbitration Award and Brief in Support[1] and would show the Court the following:

**BACKGROUND**

1. Respondent sets forth purported facts in its Opposition's Background section. The following is provided to clarify and present the full picture of McVay's background, the underlying dispute, and the bases requiring vacatur of the Final Award.

2. McVay was employed at Respondent from January 15, 2001 to January 4, 2006. He held four positions, each a promotion from the former. McVay was awarded an MVP in December 2005 for some of his work and, in total, earned four MVPs in less than five years. He completed eleven design standards in 2005, six of those from approximately mid-November to the end of December. McVay has also been awarded two patents. *See* App. p. 50. When McVay resigned,

---

[1] In accordance with Local Rule 7.1, McVay files this Reply within the fifteen days prescribed. McVay will file a separate Response, if any, to Respondent's Cross Motion to Confirm the Award within the twenty days prescribed.

Movant's Reply to Respondent's Opposition to McVay's
Motion to Vacate Arbitration Award and Brief in Support                                   page 1
R:\1\1072\60673\SubPldgs\ReplyHESOpptoMotionVacateAward.doc

he was working to complete three to four more design standards, one of which was a master software program for calculating performance envelopes, a derivative of a program he had prepared on his own. The Arbitrator failed to award him this program.

3. In 2002 McVay was calculating packer envelopes. Packer envelopes, basically, provide the performance limits for an oil well packer and such are then depicted on a graph for the customer. McVay suggested the entire calculation process might be automated. He was specifically, and consistently with each request, instructed not to work on this concept, refused training, and was not allowed time at work to prepare the software.

4. As a result, McVay taught himself code and developed the software on his own time, at his own expense, and using his own resources. None of this was done on Respondent's time, took away from McVay's work, or was part of an assignment from Respondent.

5. In October of 2003, McVay brought his software, at this point the first packer program, into Respondent's facilities. McVay kept the software password protected and the code locked with a digital signature. McVay's supervisor learned of the program through checking McVay's work as required by ISO 9001 standards.[2] McVay introduced the software to others at Respondent at his supervisor's request.

6. Respondent continually attempted to exert control over McVay's software, including forming a "team" to develop packer envelope standards in November 2004. At the initial meeting of this team, which included several levels of management, McVay made it very clear the software was his property. He explained in a closed-door meeting with supervisors after this initial meeting the software was his "intellectual property" and he had ownership rights to it.

---

[2] Interestingly, McVay was not trained to write software. ISO 9001 requires training for all job functions evidencing writing software was not one of his job functions.

Movant's Reply to Respondent's Opposition to McVay's
Motion to Vacate Arbitration Award and Brief in Support    page 2
R:\1\1072\60673\SubPldgs\ReplyHESOpptoMotionVacateAward.doc

7. In March of 2005, McVay determined it was clearly time to leave Respondent. McVay began to explore opportunities and ultimately began interviewing with Caterpillar for a job in Illinois. He was hired to work in its transmission department.

8. McVay provided his resignation letter on January 3, 2006. He specifically stated he wanted the transition to be as smooth as possible. McVay sought to resign effective January 15. This was near a standard two week resignation and the five year anniversary of his hire date. He also had scheduled vacation during this time frame in order to participate in his uncle's wedding in Indiana.

9. McVay was requested to attend an exit interview on January 3. McVay was asked to sign, by Respondent's in-house counsel, two-page "acknowledgment" (containing substantively different terms that the original IPA), and was told other employees were being legally pursued for failing to sign the acknowledgment. At the exit interview, discussions were had regarding the master program, McVay's continuing claim of ownership in various programs, and completing the master program after he left. A discussion was also had regarding the return of items McVay may have in his possession, with no final determination being made.

10. McVay felt he was being strong armed and forced to make legal decisions without the advice of counsel at the exit interview. At the end of the exit interview, it was unclear to McVay what needed to be returned, whether McVay needed to sign the acknowledgment, and whether he was going to be allowed to complete his work on the master program. To sort through these issues, he began the process of locating a lawyer.

11. On January 4, 2006, McVay told Respondent's representatives he would abide by all agreements (which included the IPA) and would return any Respondent-related items his counsel advised him to return. Respondent's representatives were told McVay needed more time for

Movant's Reply to Respondent's Opposition to McVay's
Motion to Vacate Arbitration Award and Brief in Support    page 3
R:\1\1072\60673\SubPldgs\ReplyHESOpptoMotionVacateAward.doc

counsel to assist in determining his obligations. McVay also explained he would be unable to attend another meeting with Respondent's in-house counsel until his lawyer could be up to speed and present. McVay was quizzed by two levels of upper management regarding his hearing problems, whether Respondent had provided assistance with it (which it had not), and his father's work history before being told to leave the facility that afternoon.

12.     On January 5, 2006, McVay was served with a lawsuit and Temporary Restraining Order. On the morning of January 10, 2006, boxes of documents/items and two computer CPUs were delivered to the undersigned's office to respond to the TRO. After substantial legal wrangling in the District Court in Dallas, Respondent initiated arbitration.

13.     A number of events occurred during the arbitration clearly evidencing Respondent's campaign to damage McVay. Respondent sought, and the arbitrator allowed in large part, these activities. Respondent modified electronic file(s) on the Saturday evening, and approximately five hours, after the second and final session of his deposition. Respondent used McVay's unique ISO9001 identified and used the modified file(s) at the arbitration. It refused to produce documents timely (both through the lawsuit it brought and during the course of the arbitration). McVay was forced to file motions both in the court and in the arbitration seeking documents . Respondent's activities unnecessarily increased the expense and litigiousness of this matter. It took approximately nine months to receive responsive items.

14.     Respondent even went so far as to seek, late, disgorgement of McVay's salary for the five years he worked at Respondent. Respondent invaded McVay's privacy, requested Caterpillar documents, and ultimately positioned itself to force McVay, in perpetuity, from any industry in which Respondent is involved or provides paper and electronic copies of documents and tangible things that concern its products or services. Respondent even subpoenaed McVay's father in

Movant's Reply to Respondent's Opposition to McVay's
Motion to Vacate Arbitration Award and Brief in Support                                                                                                        page 4
R:\1\1072\60673\SubPldgs\ReplyHESOpptoMotionVacateAward.doc

Oklahoma through the underlying lawsuit--the same suit it previously demanded be stayed because of the arbitration.

### MCVAY ENTITLED TO VACATUR OF FINAL AWARD

15.     Respondent contends McVay must show "evident partiality" of the Arbitrator for vacatur. This contention is inaccurate. Respondent dictated a different standard by incorporating the AAA Employment Dispute Resolution Rules as part of the Halliburton Dispute Resolution Rules.

16.     At the outset it is notable McVay received his offer letter from Respondent in late December 2000. He was asked to sign and return it. He left his home and employment in Oklahoma City, Oklahoma and moved to Dallas, Texas to work for Respondent. On January 15, 2001, on his first day of his employment, after resigning from his prior job and moving states, he was forced into an arbitration agreement. It was, as most are, a take-it-or-be-unemployed arbitration agreement offer.

17.     As part of the Halliburton Dispute Resolution Rules, the AAA Employment Dispute Resolution Rules apply. Appendix at p. 7, ¶ 2(A). As set forth in McVay's Motion, the applicable rules require that the arbitrator shall have no relations that create "an appearance of bias." AAA Employment Arbitration Rules, Rule 12(b) (ii). This Respondent-dictated standard is not the "evident partiality" Respondent would like now to impose.

18.     McVay has set forth in his initial Motion the facts establishing the appearance of bias, if not evident partiality. At the very least, if a non-negotiable arbitration agreement is required of an employee, the employer should, and must, adhere to the agreement's standards. Based on this Respondent-dictated standard, it is clear the facts set forth establish the appearance of partiality and, therefore, the entire Final Award should be vacated.

Movant's Reply to Respondent's Opposition to McVay's
Motion to Vacate Arbitration Award and Brief in Support                                      page 5
R:\1\1072\60673\SubPldgs\ReplyHESOpptoMotionVacateAward.doc

## EXPERT FEES ARE EXPERT FEES

19.  Respondent was awarded expert and consultant fees totaling $44,991.42. Respondent acknowledges the Dispute Resolution Rules prohibit the award of expert and consultant fees. *See* Opposition at p. 8, ¶ 13. However, in an effort to continue its campaign against McVay, Respondent would have this court play name games. Respondent contends since the Arbitrator named the expert and consultant fees something different, such are no longer expert fees. Authors have long discounted this wordplay:

> When I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck.[3]

> What's in a name? That which we call a rose
> By any other name would smell as sweet.[4]

Undisputedly, these are expert and consultant fees.

20.  An argument that the fees should somehow be borne by McVay is buttressed by the clear language addressing other types of fees and expenses:

> A.  The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.
>
> B.  All attorney's fees shall be borne by the Party incurring them except as otherwise provided by law, by the Plan, or in the award of the arbitrator.
>
> * * *
>
> G.  Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

Appendix at p. 11. The Rules contain specific provisions, *and exceptions*, that vary from witnesses, to attorneys fees, to a catch all for other expenses. However, no such exception exists

---

[3] Attributed to the Hoosier poet, James Whitcomb Riley, http://www.whatquote.com/quotes/James-Whitcomb-Riley/1718-When-I-see-a-bird-th.htm.
[4] *Romeo and Juliet* (II, ii, 1-2).

Movant's Reply to Respondent's Opposition to McVay's
Motion to Vacate Arbitration Award and Brief in Support                                                     page 6
R:\1\1072\60673\SubPldgs\ReplyHESOpptoMotionVacateAward.doc

for fees and expenses of experts and consultants.

21. The Arbitrator exceeded her authority in awarding expert and consultant fees, regardless of the name chosen (whether it be bird, duck, rose . . . or damages). The Dispute Resolution Rules specifically allocate to the party incurring such expenses the responsibility to bear same. *Id.* Respondent must, at a minimum, be held to its own language in its non-negotiable agreement.

### THE ARBITRATOR'S INJUNCTIVE RELIEF IS IN DISREGARD OF THE LAW

22. The Arbitrator awarded injunctive relief. The provision at issue is as follows:

> 1) Injunctive Relief against McVay as follows:
>
>    a) McVay and those acting in concert with him are enjoined from utilizing in any fashion any paper and electronic copies of any documents and tangible things that concern Respondent products or services

23. Respondent contends the Arbitrator was entitled to award injunctive relief for purposes of protecting confidential information. Respondent's argument predominately hinges on protecting confidential information. McVay did not, and has not, argued regarding the authority of an arbitrator to award injunctive relief. Such may be warranted for protecting confidential information. However, this is not what the Arbitrator ordered in the Final Award.

24. Instead, the Arbitrator has set forth an injunction that is so vague, ambiguous and overreaching it is impossible not to violate its terms, and such must be vacated. The Arbitrator did not limit it to purportedly confidential information. It is conceivable calling a phone number on a Respondent advertisement for "widgets" would be utilizing a document that concerns Respondent products. And, this very violation of the injunction could occur decades from now as absolutely no time limitation is provided. It is abundantly clear this injunctive provision is

simply and completely in disregard of the requirement an injunction be definite, clear and precise, without requiring one to search for inferences or make conclusions about which individuals may differ. Therefore, the Final Award must be vacated as it is in clear disregard of the law.

## CONCLUSION

THEREFORE, McVay requests that the Final Award be vacated as a result of arbitrator partiality. In the alternative, insofar as necessary, McVay requests the specific portions of the Final Award identified in his Motion and above be vacated as the Arbitrator exceeded her powers and the awards exhibit a manifest as regard of the law. McVay requests such other and further relief, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

/s/ Gregory M. Clift
**ROGGE DUNN**
Texas State Bar No. 06249500
**GREGORY M. CLIFT**
Texas State Bar No. 00795835
**CLOUSE DUNN KHOSHBIN LLP**
5200 Renaissance Tower
1201 Elm Street
Dallas, TX 75270-2142
Telephone:   (214) 220-3888
Facsimile:    (214) 220-3833

**ATTORNEYS FOR MOVANT**

Movant's Reply to Respondent's Opposition to McVay's
Motion to Vacate Arbitration Award and Brief in Support
R:\1\1072\60673\SubPldgs\ReplyHESOpptoMotionVacateAward.doc

page 8

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been served upon all counsel of record in accordance with the Rule of Civil Procedure, this 25th day of July, 2007.

| | |
|---|---|
| John F. Booth<br>Peter Schroeder<br>Crutsinger & Booth LLC<br>1601 Elm Street, Suite 1950<br>Dallas, TX 75201 | ☒ **VIA ECF**<br>☐ **VIA HAND DELIVERY**<br>☐ **VIA FAX (214) 220-0445**<br>☐ **VIA EMAIL: jbooth@ipoftexas.com**<br>☐ **VIA EMAIL: pschroeder@ipoftexas.com**<br>☐ **VIA FIRST CLASS MAIL**<br>☐ **VIA CERTIFIED MAIL, RRR** |

/s/ Gregory M. Clift
**GREGORY M. CLIFT**

Movant's Reply to Respondent's Opposition to McVay's
Motion to Vacate Arbitration Award and Brief in Support                                page 9
R:\1\1072\60673\SubPldgs\ReplyHESOpptoMotionVacateAward.doc

APP 050

| Date | Increase Percent | Bonus Percent | Current Monthly Salary | Increase per Month | Bonus Amount | New Monthly Salary | Job Title | Notes: |
|---|---|---|---|---|---|---|---|---|
| 12/21/00 | -- | -- | -- | -- | -- | -- | Associate Technical Prof. | Postmark on HES offer. |
| 1/15/01 | 0.00% | 0.00% | $4,500.00 | | $0.00 | | Associate Technical Prof. | First day at Halliburton |
| 7/1/02 | 5.91% | 0.00% | $4,500.00 | $266.00 | $0.00 | $4,766.00 | Associate Technical Prof. | 2001 Review/Raise |
| 8/1/02 | 9.00% | 0.00% | $4,766.00 | $429.00 | $0.00 | $5,195.00 | Technical Prof. | Promotion |
| 4/1/03 | 5.29% | 0.00% | $5,195.00 | $275.00 | $0.00 | $5,470.00 | Technical Prof. | 2002 Review/Raise |
| 5/8/03 |  | | | | | | | Hart's Engineering Innovation Award accepted at Offshore Technology Conference in Houston, Tx. One of sixteen given worldwide each year. |
| 10/16/03 | | | | | | | | MVP #1 awarded (by surprise) for packer performance envelope software. I had no idea award was coming before I was presented with it by boss (3 levels up) Austin Freeman in an informal department meeting in front of 50 of my peers. Obviously I did not have an opportunity to refuse the award. The award came with $2000 pre-tax (double the normal amount) bonus. |
| 12/15/03 | | | | | | | | MVP #2 Awarded (by surprise) for Hart's Engineering Innovation award (16 worldwide per year) instead of more valuable raise as promised by BN Murali in a face to face meeting. The award came with $1000 pre-tax bonus. |
| 2/27/04 | | | | | | | | Application # 10789631 filed for patent for Annular Pressure Relief Collar tool that I designed. Patent #7191813 issued 3/20/07. |
| 4/1/04 | 4.24% | 0.00% | $5,470.00 | $232.00 | $0.00 | $5,702.00 | Technical Prof. | 2003 Review/Raise |
| 7/20/04 | | | | | | | | MVP #3 Awarded (by surprise) for Statoil packer. Fast-track project was given 14 weeks for completion. I completed project in 7 weeks, $50,000 under budget, and passed testing on first try; Competitor Baker tried 6x in 2 years and failed. Big win for HES - news went on Statoil employees computers worldwide. Statoil bought 3 packers at $60,000 each. Award came with $1000 pre-tax bonus. |
| 8/1/04 | 5.00% | 0.00% | $5,702.00 | $285.10 | $0.00 | $5,987.10 | Senior Technical Prof. | Promotion |
| 1/19/05 | | | | | | | | Application # 038369 filed for patent for Fiber Optic Delivery System and Side Pocket Mandrel Removal System that I designed. Patent #20060159400 issued 7/20/06. Others names who did not contribute are listed first on patent. |
| 3/1/05 | | | | | | | | BP HNT packer that I designed is qualified for 20,000 psi pressure, which is the highest rating anywhere in the world. Project is completed $60,000 under budget and passed testing on first try. Two packers sold to customer at $142,000 each. "Packer milestone" e-mail circulated among top management. |
| 4/1/05 | 4.03% | 0.00% | $5,987.10 | $241.23 | $0.00 | $6,228.33 | Senior Technical Prof. | 2004 Review/Raise |
| 5/17/05 | | | | | | | | Stock Options awarded; 20%/year mature. Gary Ellis said more will come with time. No benefit ever gained from these stock options. |
| 9/1/05 | 5.00% | 0.00% | $6,228.33 | $311.42 | $0.00 | $6,539.75 | Principal Technical Prof. | Promotion |
| 12/19/05 | | | | | | | | MVP #4 Awarded (by surprise). Award says Chester has been instrumental in creating and publishing operating envelopes for packer equipment and other packer design standards. ... Chester is the leader in the creation of technical documentation and sharing his knowledge in concise practices... Award came from technology manager outside my immediate group, and came with $1000 pre-tax bonus. |
| 1/3/06 | | | | | | | | Handed in resignation at 8am, resignation is effective 1/15/06. Offered further assistance to complete "master" program. |
| 1/4/06 | | | | | | | | Last day in the office, I did not leave to go home until instructed to do so. I left office about 4pm. Daryl Stanaway changes my resignation date to 1/4/06 despite my written objections. |
| 1/5/06 | | | | | | | | Lawsuit filed at 10am in Dallas court, served at 2:40pm. |
| 1/15/06 | | | | | | | | Resignation effective date on Resignation Letter. |